IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DO NO HARM,<br>11357 Nuckols Rd., Pmb 115<br>Glen Allen, VA 23059<br><br>          *Plaintiff*,<br><br> v.<br><br>HEALTH AFFAIRS,<br>1220 19th Street, NW, Suite 800<br>Washington, DC 20036<br><br> and<br><br>PROJECT HOPE,<br>1220 19th Street, NW, Suite 800<br>Washington, DC 20036<br><br>          *Defendants*. | Case No. 1:22-cv-02670-RDM |

## AMENDED VERIFIED COMPLAINT

Do No Harm brings this amended verified complaint for declaratory relief and injunctive relief against Health Affairs and Project HOPE and alleges as follows:

### INTRODUCTION

1. Racial discrimination is fundamentally "'immoral,'" "'inherently wrong,'" and "'destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in judgment). "'[E]very time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all.'" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 316 (2013) (Thomas, J., concurring).

2. Racial classifications demean us all even when done by private entities. For that reason, Congress, through the Civil Rights Act of 1866 (42 U.S.C. §1981), extended the promise of equal protection and racial neutrality to contractual relationships. And for the same reason, Congress enacted Title VI of the Civil Rights Act and Section 1557 of the Affordable Care Act: "'Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion

1

which encourages, entrenches, subsidizes, or results in racial discrimination.'" *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1170 (D.C. Cir. 2004).

3. Defendants, Health Affairs and Project HOPE, are running a racially discriminatory health journal fellowship—the Health Equity Fellowship for Trainees—that excludes white applicants.

4. To be eligible for the Fellowship, applicants must identify as American/Alaskan Indian, African American, Asian American, Native Hawaiian and other Pacific Islander, or Hispanic/Latino. The Fellowship offers numerous benefits, including mentorship with published researchers and journal staff, opportunity to publish research in a highly respected peer-reviewed journal, introduction to a powerful professional network, and a free subscription to the Health Affairs' *Insider*. According to Defendants, however, white applicants need not apply.

5. Defendants' no-whites-allowed Fellowship is illegal. Defendants are blatantly discriminating against white applicants by blocking the creation of contractual relationships because of race, in violation of §1981. And because Defendants receive millions of dollars in federal funds every year and are primarily engaged in health services, all their operations—including the Fellowship—are covered by the federal prohibitions on racial discrimination in Title VI and Section 1557. All racial classifications are subject to strict scrutiny under federal law, which Defendants' blanket racial ban cannot come close to satisfying.

6. Defendants' racially exclusionary Fellowship is also illegal under D.C. law, which prohibits professional associations from engaging in racial discrimination, or publishing racially discriminatory advertisements, in connection with any training programs. *See* D.C. Code §2-2101.02(10), §2-1402.11(a)(4)(A), (B).

**PARTIES**

7. Plaintiff, Do No Harm, is a Virginia-based, nationwide membership organization consisting of a diverse group of physicians, healthcare professionals, medical students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies, including the recent rise in explicit racial discrimination in graduate and postgraduate medical programs.

8. Do No Harm accomplishes its mission through education about and advocacy against the divisive and discriminatory ideas being embedded within medical education, training, research, practice, and policy. It has, among other things, filed litigation against the Biden administration for introducing discriminatory "equity" criteria into Medicare and filed OCR complaints against medical schools that create fellowships and scholarships that exclude whites and Asian-Americans.

9. Do No Harm has at least one member who is being harmed by Defendants' racially exclusionary Fellowship and who is ready and able to apply for the 2024 and future classes if Defendants stop discriminating against white applicants.

10. Defendant Health Affairs is a well-known healthcare journal published by Project Hope, with its principal place of business and headquarters located in Washington, D.C.

11. Health Affairs, together with Project HOPE, launched and is running the racially discriminatory Health Equity Fellowship for Trainees.

12. Defendant Project HOPE is a tax-exempt 501(c)(3) organization that principally provides direct healthcare services, supplies, medicines, equipment, and training for healthcare professionals, and engages in healthcare policy discussions.

13. Project HOPE is running the racially exclusionary Health Equity Fellowship for Trainees along with Health Affairs.

14. Project HOPE has its principal place of business and headquarters located in Washington, D.C.

15. Project HOPE receives millions of federal funds every year from agencies like the U.S. Department of Health and Human Services, U.S. Agency for International Development, U.S. Department of State, and others.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. §1331, §1343, and §1367.

17. Venue is proper under 28 U.S.C. §1391 because Defendants' principal place of business and headquarters are in Washington, D.C., and a substantial part of the events or omissions giving rise to the claims occurred in Washington, D.C.

## FACTUAL ALLEGATIONS

**A.    Project HOPE provides health services throughout the United States and receives millions of dollars in federal funds.**

18. Project HOPE provides direct healthcare services throughout the United States and the world; provides healthcare supplies, equipment, and training to healthcare professionals; and engages in healthcare policy discussions.

19. Project HOPE's primary activities are in healthcare. Proj. HOPE, *About Us, What We Do* (last visited Nov. 21, 2022), perma.cc/Z3V6-2AWZ

20. Project HOPE "provid[es] direct health care services." *Id.* Especially within the United States, Project Hope maintains a significant presence and provides direct medical and healthcare services.

21. Project HOPE has similarly told the IRS in its tax filings that "disaster and health care" constitute its "largest program service[ ], as measured by expenses." ECF 17-3, at 2.

22. Project HOPE also publishes Health Affairs, a highly prestigious, peer-reviewed healthcare journal that "explores health policy issues of current concern in domestic and international spheres." Health Affairs, *About Health Affairs* (last visited Nov. 21, 2022), perma.cc/RB5D-M623.

23. Health Affairs claims that its "mission is to serve as a high-level, non-partisan forum to promote analysis and discussion on improving health and healthcare, and to address such issues as cost, quality, and access." *Id.*

24. Health Affairs boasts that its publications have been cited by "national media" as well as "U.S. administration officials, U.S. lawmakers, … ministry of health leaders around the globe," and "U.S. Supreme Court Chief Justice Roberts." *Id.*

25. Health Affairs is a selective medical journal: with 1,700 submissions annually, Health Affairs accepts only 10% of the total submissions. *Id.* Publication in Health Affairs is prestigious, as the journal is considered "the bible of health policy." Pearlstein, *Consolidation: Health Care's Empty Promise*, Wash. Post (Jan. 12, 2005), wapo.st/3pWy6Y7.

26. Project HOPE has received millions of dollars in federal assistance over many years, in addition to its 501(c)(3) tax-exempt status. In 2022 alone, it received over $8.7 million from the U.S. Department of Health and Human Services. *See* Tracking Accountability in Government Grants System (TAGGS), *Project HOPE – The People-to-People Health Foundation, Inc.*, Dep't of Health & Hum. Servs. (last visited Nov. 21, 2022), perma.cc/VA3A-KHGH.

27. Similarly, Project HOPE has received over $9.6 million from the U.S. Agency for International Development. *Recipient Profile – Project Hope*, USASpending.gov (last visited Nov. 21, 2022), perma.cc/5NRP-YGGX.

28. According to Project HOPE's 2021 Annual Report, it received funds from HHS, USAID, and the U.S. Department of State last year. Proj. HOPE, *2021 Annual Report* 21 (last visited Nov. 21, 2022), perma.cc/6QAR-BZEM.

29. And according to its 2020 audited financial statement, Project HOPE received approximately $26.1 million in federal funds two years ago. Proj. HOPE, *Financial Report* 7 (Dec. 31, 2020), perma.cc/HR85-65T3.

30. Federal funds are extended to Project HOPE as a whole, and they go into Project HOPE's overall operating budget which Project HOPE uses to cover overhead and other facilities and administrative costs.

**B.    Project Hope and Health Affairs launch and oversee the Health Equity Fellowship for Trainees that excludes white applicants.**

31. Defendants run the highly selective Health Equity Fellowship for Trainees, which was first launched in 2021. *See* Health Affairs, *Health Equity Fellowships* (last visited Nov. 21, 2022), perma.cc/YCY9-FDW2; ECF 22-2, at 2-4. The Fellowship is an ongoing program, and it selects a new group of fellows each year.

32. The Fellowship's eligibility requirements have not changed since its launch. The 2024 class of fellows will be selected in 2023.

33. The Fellowship is part of Health Affairs' national initiative "to advance racial equity in health policy and health services scholarly publishing." ECF 22-2, at 3.

34. The Fellowship's stated objective is to "increase" the "quantity of equity-related research published in *Health Affairs* authored by members of racial and ethnic groups that have historically been underrepresented in scholarly publishing." *Id.*

35. The Fellowship offers and promises numerous benefits to the selected fellows: one-on-one mentorship from published researchers and Health Affairs editorial staff "to increase the likelihood that the fellow's submitted manuscript will be accepted for publication in *Health Affairs* or another journal"; "[p]ublication of at least one *Health Affairs Forefront* post relating to their subject area and/or experience with the fellowship"; one year of free membership to *Health Affairs Insider* (worth about $180); an opportunity to serve as a brand advocate for Health Affairs; and expanded

6

professional networks and engagements with other fellows and peer health services researchers. Health Affairs, *Health Equity Fellowships*.

36. In exchange for these benefits, fellows are "required to partake in workshops/seminars on publishing, peer-reviewing, research methods for racial health equity research, etc," and are "required to publish at least one *Health Affairs* Forefront article relating to their subject area and/or experience with the Fellowship." ECF 22-2, at 3.

37. Defendants estimate that the Fellowship requires a minimum of four hours of commitment every month from the fellows. *Id.*

38. Spots for the Fellowship are limited, and Defendants select no more than 10 fellows per year.

39. To be eligible for the Fellowship, an applicant must be a "graduate-level (doctoral) student, postdoctoral researcher, or early career researcher who is no more than seven years outside of having earned [the] graduate degree." *Id.*

40. The applicant must also "[b]e engaged in health services research that advances racial healthy equity among historically marginalized populations" and "[w]orking on a research project that is within one year of being submitted for publishing." *Id.*

41. The Fellowship does not exclude applicants merely because they have not extensively engaged in racial health equity research. The Fellowship accepts applicants if they have previously engaged in racial health equity research in the past and are willing to expand their research to racial health equity, including by participating in the Fellowship.

42. For example, one of the fellows in the 2022 class had a background in education policy, studies gang violence, and is a tenure-track faculty member at the school of education at a private university.

43. Defendants, however, impose rigid race requirements for applicants.

44. According to Defendants, "[t]o be eligible for *Health Affairs*' Health Equity Fellowship for Trainees, [an applicant] must … [i]dentify as American Indian/Alaskan Native, African American/Black, Asian American/Pacific Islander, and Hispanic/Latino." ECF 22-2, at 3.

45. White students and researchers who identify only as white do not meet Defendants' race-based eligibility criterion to apply to the Fellowship. Non-Hispanic/Latino whites are ineligible.

46. Any suggestion—made only after the initiation of federal litigation—that the Fellowship is equally open to non-Hispanic whites would be inaccurate and misleading.

47. Until it was sued in 2022, Health Affairs never once stated on its website or anywhere else that the Fellowship's racial requirements are not requirements.

48. The racial requirement is listed on a bullet-point list and described as a matter of "eligib[ility]" that "must" be satisfied. ECF 22-2, at 3-4. Health Affairs insists that the other requirements on that same list—minimum education and research interests—are in fact requirements. It has never claimed that the racial requirement is a typographical error or a misunderstanding.

49. Prior fellows are listed on the website, and none appears to be white alone. Although a few might identify as white, people who are ethnically Hispanic can be racially white. Health Affairs has never suggested that *all* whites, regardless of identified ethnicity, are eligible for the Fellowship.

50. The explicit goal of the Fellowship is to "increase" the "quantity of racial equity-related research published in the journal authored *by members of racial and ethnic groups* that have historically been underrepresented in scholarly publishing." *Id.* (Emphasis added.) That goal reveals an intent to exclude whites, fill up as many slots as possible with non-whites before admitting any whites, use facially exclusionary requirements to deter whites from applying, or do all three.

51. In fact, Defendants have defended in court their facially race-based eligibility criteria that exclude white applicants. They have argued, among other things, that racial exclusion would not be unlawful because they have a First Amendment right to racially discriminate in this context.

8

52. Defendants intend to retain these racial preferences in their criteria for the Fellowship.

**C. Do No Harm's white members are ineligible to apply to the Fellowship solely on account of race.**

53. Do No Harm has at least one member who is currently being harmed by Defendants' racially exclusionary Fellowship.

54. Member A is a member of Do No Harm.

55. Member A is currently a research fellow at a think tank.

56. Member A received a Ph.D. in 2019 and completed postdoctoral work in 2020 from top public and private universities in the United States with rigorous research and multidisciplinary programs.

57. Member A's past research has addressed regulatory barriers that disproportionately affect and disadvantage racial minorities.

58. One of Member A's ongoing research topics concerns issues of race and equity in public health. For example, Member A has critiqued, on race and health-equity grounds, the methodology employed in a recently published paper concerning COVID-19.

59. Member A's health-policy research has been cited by major national print media outlets.

60. Member A currently has ongoing (and years-long) research projects relating to race-equity issues. Member A has submitted articles to Health Affairs in the past.

61. Member A wishes to pursue research and publish in a journal on topics related to race equity because Member A cares about the issue and because being published in a peer-reviewed journal is an important professional milestone. The Fellowship also offers numerous benefits—like the mentorship with published researchers and journal staff, professional connections, and other opportunities and benefits—that Member A wishes to take advantage of.

62. Member A meets all nonracial criteria for applying to the Fellowship.

63. Member A is, however, white and does not identify as any other race/ethnicity.

64. Because Member A is a white applicant who does not also identify as a member of Defendants' preferred racial and ethnic groups, Member A is ineligible for the Fellowship.

65. Although Member A is ready and able to apply once Defendants stop discriminating, Member A wants his or her application to be treated fairly under non-racial criteria and does not wish to make a futile gesture by submitting an application while Defendants maintain a racially exclusionary criterion against white applicants. Nor does Member A currently wish to participate in a fellowship for which selections were made on racially discriminatory grounds.

66. Member A is ready and able to apply to the Fellowship for the 2024 class and future classes if Defendants stop discriminating against white applicants.

## CLAIMS FOR RELIEF
### COUNT I
### Violation of the Civil Rights Act of 1866
### 42 U.S.C. §1981

67. Do No Harm repeats and realleges each of the prior allegations.

68. The Civil Rights Act of 1866 states that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a).

69. Section 1981 "protects the equal right of all persons … to make and enforce contracts without respect to race." *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 475 (2006) (cleaned up); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 298 (1976) (Section 1981 "was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.").

70. Section 1981 prohibits "a private offeror" from "refus[ing] to extend" to a racial group "the same *opportunity* to enter into contracts as he extends to" others. *Comcast Corp. v. Nat'l Ass'n of*

*African Am.-Owned Media*, 140 S.Ct. 1009, 1016 (2020) (emphasis added). "An equal 'right … to make contracts' is an empty promise without equal opportunities to present or receive offers." *Id.* at 1020 (Ginsburg, J., concurring in part and concurring in the judgment) (cleaned up).

71. Section 1981 authorizes equitable and legal relief, including compensatory and punitive damages. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

72. Defendants are violating §1981 by excluding white applicants from the Fellowship because of their race.

73. The Fellowship implicates the activities enumerated under §1981: "making … of contracts."

74. The Fellowship creates contractual relationships between Defendants and the fellows.

75. Defendants offer select applicants admission to, and participation in, the Fellowship.

76. Once an applicant accepts the offer to participate in the Fellowship as a fellow, the fellow is "required to partake in the workshops/seminars on publishing, peer-reviewing, research methods for racial health equity research, etc." ECF 22-2, at 3.

77. The fellows are also "required to publish at least one *Health Affairs* Forefront article relating to their subject area and/or experience with the Fellowship." *Id.*

78. The fellows are expected to commit at least four hours a month to the Fellowship.

79. Fellows must work on a manuscript that is related to racial equity.

80. The fellows must agree to satisfy those requirements and others of participation in the Fellowship.

81. Once Defendants offer an applicant a spot in the Fellowship and the applicant accepts that offer, there is mutual assent on the part of that fellow and Defendants and a contract is formed.

82. The fellows' performances and promises to perform and complete the expected tasks in the Fellowship are induced by and given in exchange for Defendants' promises and performances

about the benefits of and participation in the Fellowship. When fellows accept Defendants' offer of participation in the Fellowship, they do so because of the promised benefits of the Fellowship.

83. Defendants promise to provide "[o]ne-on-one mentorship from health equity researchers who have published in *Health Affairs*" and "[o]ne-on-one guidance from *Health Affairs* editorial staff to increase the likelihood that the fellow's submitted manuscript will be accepted for publication in *Health Affairs* or another journal."

84. Defendants also promise "[p]ublication of at least one *Health Affairs Forefront* post relating to their subject area and/or experience with the fellowship."

85. Defendants promise one year of free membership to *Health Affairs Insider* (currently priced at $15 per month). *See* Health Affairs, *Where Health Policy Advances* (last visited Nov. 21, 2022), perma.cc/L86L-PRXF.

86. And Defendants promise to provide the fellows with the opportunities "to serve as a brand advocate for *Health Affairs*" and "expand their professional networks."

87. Defendants bargain for the fellows' participation, time, manuscripts, and *Health Affairs Forefront* posts to advance their own goals.

88. For example, Defendants claim that the Fellowship "is part of *Health Affairs*' national initiative to advance racial equity in health policy and health services scholarly publishing. Its objective is to value and increase the *quality* and *quantity* of equity-related research published in *Health Affairs* authored by members of racial and ethnic groups that have historically been underrepresented in scholarly publishing." Defendants also benefit from the publication of "at least one Health Affairs Forefront article" relating to racial equity in the fellows' "subject area and/or experience with the Fellowship."

89. Also, by submitting an application for the Fellowship, applicants agree that "any false statement on [the] form or in a personal or medial interview shall be sufficient cause for rejection or

12

dismissal." ECF 22-3, at 6. The applicant also agrees to grant "Project HOPE … to investigate [their] background to determine any and all information of concern" and to "release [Project HOPE] from all liability for any damages on account of … furnishing said information." *Id.*

90. When the applicants submit applications, they also "agree to have to have a medical examination prior to the commencement of duties if required" and to furnish licensing information if required. *Id.*

91. Defendants' discrimination against white applicants is intentional and based on race.

92. Defendants' eligibility criterion is racially discriminatory on its face.

93. Under §1981, "a plaintiff who alleges a policy that is discriminatory *on its face* is not required to make further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

94. Any burden-shifting test is similarly "inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 11, 121-22 (1985); *see also Gratz v. Bollinger*, 539 U.S. 244, 275-76 & n.23 (2003) (not applying any burden-shifting test when the university's admissions policy was race-based).

95. The text of §1981 does not allow for any racial classifications.

96. Even if it did, racial classifications must satisfy strict scrutiny because §1981 is coextensive with the Equal Protection Clause. *See, e.g. Gratz*, 539 U.S. at 276 n.23 (explaining that "purposeful discrimination that violates the Equal Protection Clause … will also violate §1981" and applying strict scrutiny); *Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 557 (3d Cir. 2011) ("§1981 is coextensive with … the Equal Protection Clause.").

97. Defendants cannot satisfy strict scrutiny.

98. Defendants cannot show a compelling interest for excluding white applicants from the Fellowship. A "generalized assertion that there has been past discrimination" cannot serve as a

compelling interest for present racial discrimination. *J.A. Croson Co.*, 488 U.S. at 498. Nor can providing "role models" for minority students. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 276 (1986). Ensuring "programming diversity" is also insufficient. *Lutheran Church-Mo. Synod v. FCC*, 141 F.3d 344, 350 (D.C. Cir. 1998).

99. The complete exclusion of white applicants from the Fellowship cannot be narrowly tailored. There is also no evidence that Defendants ever "considered methods other than explicit racial classification to achieve their stated goals." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 734 (2007). Nor can Defendants show "the most exact connection between justification and classification." *Wygant*, 476 U.S. at 280.

## COUNT II
### Violation of Title VI of the Civil Rights Act of 1964
### 42 U.S.C. §2000d

100. Do No Harm repeats and realleges each of the prior allegations.

101. Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

102. Title VI's protections are "coextensive with the Equal Protection Clause of the Fourteenth Amendment." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 980 F.3d 157, 185 (1st Cir. 2020).

103. Under Title VI, "the term 'program or activity' and the term 'program' mean *all of the operations* of … [a] private organization": (i) "if assistance is extended to such private organization … as a whole" or (ii) if the private organization "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 42 U.S.C. §2000d-4a(3)(A)(i)-(ii) (emphasis added).

104. Private individuals and entities can sue to enforce Title VI and obtain both injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

105. Project HOPE is principally engaged in the business of providing "education, health care, housing, social services, or parks and recreation."

106. Project HOPE also receives federal assistance provided to it as a whole.

107. Project HOPE and all its operations—including Health Affairs and the Health Equity Fellowship for Trainees—are covered by Title VI.

108. Defendants are running the racially discriminatory Fellowship which excludes white applicants, like Do No Harm's Member A, from applying to and participating in the Fellowship.

109. White applicants, like Member A, are and will be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" the Fellowship solely based on their race. §2000d.

110. Defendants' racial classification (and outright race-based exclusion) is subject to strict scrutiny, which Defendants cannot satisfy.

111. Defendants cannot show a compelling interest for excluding white applicants from the Fellowship.

112. The complete exclusion of white applicants from the Fellowship is also not narrowly tailored.

### COUNT III
### Violation of Section 1557 of the Affordable Care Act
### 42 U.S.C. §18116(a)

113. Do No Harm repeats and realleges each of its prior allegations.

114. Section 1557 of the Affordable Care Act states that "[a]n individual shall not, on the ground prohibited under title VI … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, *any health program or activity, any part of which is receiving Federal*

15

*financial assistance*, including credits, subsidies, or contracts of insurance." 42 U.S.C. §18116(a) (emphasis added).

115. "The phrase 'health program or activity' in section 1557 plainly includes all the operations of a business principally engaged in providing healthcare." *T.S. ex rel. T.M.S.*, 43 F.4th 737, 743 (7th Cir. 2022).

116. Consistent with Section 1557's plain text, HHS regulations define "health program or activity" to "encompas[s] all of the operations of entities principally engaged in the business of providing healthcare that receive Federal financial assistance," 45 C.F.R. §92.3(b), including those "provided by [HHS]," §92.3(a)(1).

117. Private entities and individuals can sue to enforce Section 1557 and obtain both injunctive relief and damages. §18116(a).

118. Project HOPE holds itself out as being, and is, principally engaged in providing healthcare.

119. Project HOPE also receives federal funds from HHS and other federal agencies.

120. And these funds are provided to Project HOPE as a whole as they go into Project HOPE's overall operating budget and are used to cover Project HOPE's overhead costs.

121. Project HOPE's entire operations—including Health Affairs and the Health Equity Fellowship for Trainees—are covered by Section 1557.

122. White applicants, like Do Ho Harm's Member A, are and will be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" the Fellowship solely based on their race. §18116(a).

123. In addition, because Defendants are violating Title VI, they are also violating Section 1557.

**COUNT IV**
**Violation of D.C. Human Rights Law**
**D.C. Code §2-1402.11(a)(4)(A)**

124. Do No Harm repeats and realleges each of the prior allegations.

125. Under D.C. law, it is an "unlawful discriminatory practice …, wholly or partially for a discriminatory reason based upon the actual or perceived rac[e] … of any individual," D.C. Code §2-1402.11(a), for an employer "[t]o discriminate against any individual in admission to … any program established to provide apprenticeship or other training or retraining," §2-1402.11(a)(4)(A).

126. An "employer"—under D.C. law—includes "any professional association." §2-1401.02(10).

127. D.C. law allows "[a]ny person … aggrieved by an unlawful discriminatory practice" to "have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate." §2-1403.16(a).

128. The Fellowship run by Health Affairs constitutes a training program. *See* Health Affairs, *Health Equity Fellowships* (Fellowship consists of monthly meetings, seminars, and events and mentoring the fellows to publish articles).

129. Defendants agree that the Fellowship is a "training program." ECF 16-3, at 5.

130. Defendants' categorical exclusion of white applicants from the Fellowship is a discriminatory act. §2-1402.11(a)(4)(A).

131. Defendants' exclusion of white applicants was "wholly or partially for a discriminatory reason based upon the actual or perceived rac[e] … of any individual"—namely, because they are white. §2-1402.11(a).

132. Member A is able and ready to apply to the Fellowship if Defendants stop discriminating.

17

## COUNT V
### Violation of D.C. Human Rights Law
### D.C. Code §2-1402.11(a)(4)(B)

133. Do No Harm repeats and realleges each of the prior allegations.

134. D.C. law also makes it unlawful to "print or publish … any notice or advertisement, or use any publication form" that "unlawfully indicat[es] any preference, limitation, specification, or distinction, based on the race, color, …, [and] national origin." §2-1402.11(a)(4)(B).

135. The D.C. Human Rights Law is "to be generously construed" consistent with the fact that it is "a broad remedial statute" and "a 'powerful, flexible and far-reaching prohibition against discrimination of many kinds.'" *Geo. Wash. Univ. v. D.C. Bd. of Adjustment*, 831 A.2d 921, 939 (D.C. 2003).

136. An "employer"—under D.C. law—includes "any professional association." §2-1401.02(10).

137. D.C. law prohibits employers and/or professional associations from "unlawfully indicating any preference, limitation, specification, or distinction" for their training programs "based on the race, color, …, [and] national origin." §2-1402.11(a)(4)(B).

138. The Fellowship constitutes a training program under D.C. law.

139. Defendants posted racially exclusionary Fellowship eligibility criteria on their websites, stating that white applicants are not eligible to apply to the Fellowship.

140. Defendants' racially discriminatory advertisements are preventing Member A from applying to the Fellowship.

## PRAYER FOR RELIEF

Do No Harm respectfully requests that this Court enter judgment in its favor and against Defendants and provide the following relief:

A.     A declaratory judgment that Defendants' Health Equity Fellowship for Trainees violates 42 U.S.C. §1981, Title VI, Section 1557 of the Affordable Care Act, and the D.C. Human Rights Law;

B.     A permanent injunction barring Defendants from maintaining racially discriminatory eligibility criteria for the Fellowship and ordering Defendants to formulate new eligibility criteria that are race neutral;

C.     Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws; and

D.     All other relief that Do No Harm is entitled to, as the Court deems just and proper.

Dated: November 21, 2022　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　 */s/ Cameron T. Norris*
　　　　　　　　　　　　　　　　　　　　　　　Thomas R. McCarthy (DC Bar No. 489651)
　　　　　　　　　　　　　　　　　　　　　　　Cameron T. Norris (VA Bar No. 91624)
　　　　　　　　　　　　　　　　　　　　　　　Frank H. Chang (DC Bar No. 1686578)
　　　　　　　　　　　　　　　　　　　　　　　CONSOVOY MCCARTHY PLLC
　　　　　　　　　　　　　　　　　　　　　　　1600 Wilson Blvd., Ste. 700
　　　　　　　　　　　　　　　　　　　　　　　Arlington, VA 22209
　　　　　　　　　　　　　　　　　　　　　　　(703) 243-9423
　　　　　　　　　　　　　　　　　　　　　　　tom@consovoymccarthy.com
　　　　　　　　　　　　　　　　　　　　　　　cam@consovoymccarthy.com
　　　　　　　　　　　　　　　　　　　　　　　frank@consovoymccarthy.com

## VERIFICATION

I, Kristina Rasmussen, declare as follows:

1. I am over the age of 18, of sound mind, and otherwise competent to sign this verification.

2. I am the Executive Director of Do No Harm.

3. I have reviewed this verified complaint.

4. For the allegations within my personal knowledge, I believe them all to be true.

5. For the allegations not within my personal knowledge, I believe them to be all true based on my review of the cited policies and documents and based on my conversations with Do No Harm's members, including Member A.

6. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 21, 2022

*/s/ Kristina Rasmussen*
Kristina Rasmussen
Executive Director of Do No Harm