**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DO NO HARM,

*Plaintiff*,

v.

HEALTH AFFAIRS; and PROJECT HOPE,

*Defendants.*

Case No. 1:22-cv-02670-RDM

**ORAL HEARING REQUESTED**

**PLAINTIFF DO NO HARM'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................iii

Introduction....................................................................................................................................1

Background....................................................................................................................................3

    A.    Project HOPE receives millions of dollars in federal funds and all of its operations are covered by Title VI and §1557. ..............................................................3

    B.    Project Hope and Health Affairs launch and oversee the Health Equity Fellowship for Trainees that excludes white applicants. .................................................4

    C.    Do No Harm has members who are ineligible to apply to the Fellowship on account of race...........................................................................................................6

Standard of Review........................................................................................................................8

Argument .......................................................................................................................................9

  I.    Do No Harm has associational standing...................................................................9

    A.    Member A would have standing on his own...............................................9

    B.    The interests Do No Harm seeks to protect are germane to its purpose................19

    C.    The participation of Member A is unnecessary. ...........................................19

  II.    Do No Harm has stated claims against Defendants under Title VI, §1557, §1981, and the DC law. ...................................................................................................21

    A.    Do No Harm has stated claims under Title VI and §1557 by alleging that its members are excluded from the Fellowship based on race......................................21

    B.    Do No Harm has stated a claim under §1981 because Defendants do not offer white applicants the same opportunity to enter into contractual relationships......23

    C.    Do No Harm has stated a claim under D.C law...........................................................30

    D.    Defendants' other arguments are forfeited and otherwise unavailing. ....................32

Conclusion...................................................................................................................................35

Certificate of Service ..................................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*A.N.S.W.E.R. Coal. v. Kempthorne,*
  493 F. Supp. 2d 34 (D.D.C. 2007)........................................................................16

*Adam v. Obama for America,*
  210 F. Supp. 3d 979 (N.D. Ill. 2016).............................................................. 27, 29

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995).....................................................................................33

*AFPF v. Bonta,*
  141 S.Ct. 2373 (2021)..................................................................................18

*Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013).....................................................................................33

*Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans Inc.,*
  525 F.3d 8 (D.C. Cir. 2008)............................................................................8

*Allen v. Wright,*
  468 U.S. 737 (1984).....................................................................................15

*Am's Health Ins. Plans v. Hudgens,*
  915 F. Supp. 2d 1340 (N.D. Ga. 2012)...........................................................18

*Armeninan Assembly of Am., Inc. v. Cafesjian,*
  924 F. Supp. 2d 183 (D.D.C. 2013).................................................................22

*Baldwin v. Morgan,*
  287 F.2d 750 (5th Cir. 1961)..........................................................................12

*Barbour v. Wash. Metro. Area Transit Auth.,*
  374 F.3d 1161 (D.C. Cir. 2004).......................................................................33

*Barnes v. Gorman,*
  536 U.S. 181 (2002).....................................................................................33

*\*Bldg. & Constr. Trades Council v. Downtown Dev., Inc.,*
  448 F.3d 138 (2d Cir. 2006)...........................................................................16

*Bob Jones Univ. v. U.S.,*
  461 U.S. 574 (1983).....................................................................................34

*Carney v. Adams,*
  141 S.Ct. 493 (2020)....................................................................................11

*Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.,*
  154 F. Supp. 2d 40 (D.D.C. 2001)....................................................................8

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
  140 S.Ct. 1009 (2020)................................................................ 10, 23, 24, 30

*Comm. for Effective Cellular Rules v. F.C.C.,*
  53 F.3d 1309 (D.C. Cir. 1995).........................................................................20

*Cox v. Nielsen*,
  2019 WL 1359806 (D.D.C. Mar. 26, 2019) ................................................................ 32, 33

*Ctr. for Biological Diversity v. Regan*,
  597 F. Supp. 3d 173 (D.D.C. 2022) .................................................................................. 8

*Disability Rts. Wisconsin, Inc. v. Walworth Cnty. Bd. of Supervisors*,
  522 F.3d 796 (7th Cir. 2008) ......................................................................................... 18

*Doe v. Stincer*,
  175 F.3d 879 (11th Cir. 1999) ....................................................................................... 18

*Domino's Pizza, Inc v. McDonald*,
  546 U.S. 470 (2006) .......................................................................................... 23, 24, 25

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*,
  928 F.3d 95 (D.C. Cir. 2019) ...................................................................................... 9, 19

*Equal Rts. Ctr. v. Abercrombie & Fitch Co.*,
  767 F. Supp. 2d 510 (D. Md. 2010) .............................................................................. 20

*FAIR v. Rumsfeld*,
  291 F. Supp. 2d 269 (D.N.J. 2003) ........................................................................... 17, 18

*Finch v. City of Indianapolis*,
  886 F. Supp. 2d 945 (S.D. Ind. 2012) .......................................................................... 33

*Foman v. Davis*,
  371 U.S. 178 (1962) ......................................................................................................... 9

*Geo. Wash. Univ. v. D.C. Bd. of Adjustment*,
  831 A.2d 921 (D.C. 2003) ............................................................................................. 31

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................. 2, 12, 15, 22, 23, 25

*Greater Birmingham Ministries v. Sec'y of State*,
  992 F.3d 1299 (11th Cir. 2021) ..................................................................................... 20

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984) ....................................................................................................... 34

*Hagemann v. Molinari*,
  14 F. Supp. 2d 277 (E.D.N.Y. 1998) ............................................................................ 29

*Hallal v. RDV Sports, Inc.*,
  682 So. 2d 1235 (Fla. Dist. Ct. App. 1996) .................................................................. 29

*Hamer v. Sidway*,
  124 N.Y. 538 (1891) ...................................................................................................... 27

*Hammon v. Barry*,
  826 F.2d 73 (D.C. Cir. 1987) ........................................................................................ 33

*Hancock Cnty. Bd. of Sup'rs v. Ruhr*,
  487 F. App'x 189 (5th Cir. 2012) .................................................................................. 17

*Hassan v. City of New York*,
  804 F.3d 277 (3d Cir. 2015) ........................................................................... 31

*Hill v. Ross*,
  183 F.3d 586 (7th Cir.1999) ......................................................................... 33

*Hollander v. Sears, Roebuck & Co.*,
  450 F. Supp. 496 (D. Conn. 1978) ....................................................... 23, 28, 29

*Hosp. Council of W. Pennsylvania v. City of Pittsburgh*,
  949 F.2d 83 (3d Cir. 1991) ........................................................................... 19

*Howard v. Chimps, Inc.*,
  284 P.3d 1181 (Ore. App. Ct. 2012) ........................................................ 26, 29

*\*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977) ............................................................................ 2, 11, 23

*Johnson v. Transportation Agency*,
  480 U.S. 616 (1987) ..................................................................................... 33

*Kennedy v. D.C. Gov't*,
  519 F. Supp. 2d 50 (D.D.C. 2007) ................................................................ 25

*\*Lauture v. Int'l Bus. Machines Corp.*,
  216 F.3d 258 (2d Cir. 2000) .................................................................... 25, 28

*Lewis v. Greyhound Corp.*,
  199 F. Supp. 210 (M.D. Ala. 1961) .............................................................. 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..................................................................................... 15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................. 9, 16

*Marvelli v. Chaps Cmty. Health Ctr.*,
  193 F. Supp. 2d 636 (E.D.N.Y. 2002) ........................................................... 29

*McDonald v. Santa Fe Trail Transp. Co.*,
  427 U.S. 273 (1976) ..................................................................................... 23

*Moore v. U.S. Dep't of Agric.*,
  993 F.2d 1222 (5th Cir. 1993) ...................................................................... 10

*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) ..................................................................................... 11

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449 (1958) ................................................................................ 18, 34

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................. 9, 18

*\*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ............................................................................ 2, 10, 12

*New York v. U.S. Dep't of Com. (Census Case),
    351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................................................................. 18, 19

NRDC v. Mineta,
    2005 WL 1075355 (S.D.N.Y. May 3, 2005) ............................................................. 18

*Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.,
    573 F. Supp. 3d 324 (D.D.C. 2021) ................................................ 2, 8, 9, 12, 16

Roberts v. U.S. Jaycees,
    468 U.S. 609 (1984) ...................................................................................................... 34

Runyon v. McCrary,
    427 U.S. 160  (1976) .................................................................................................... 29

Schneider v. Kissinger,
    412 F.3d 190 (D.C. Cir. 2005) ............................................................................ 32, 33

*Shea v. Kerry,
    796 F.3d 42 (D.C. Cir. 2015) ............................................................ 2, 10, 14, 15, 20

*Speech First, Inc. v. Cartwright,
    32 F.4th 1110 (11th Cir. 2022) ................................................................................... 18

Spokeo, Inc. v. Robins,
    578 U.S. 330 (2016) ......................................................................................................... 9

Stafford v. Geo. Wash. Univ.,
    2019 WL 237333 (D.D.C. June 5, 2019). ................................................................. 22

Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.,
    261 F. Supp. 3d 99 (D. Mass. 2017) ........................................................................ 20

Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.,
    980 F.3d 157 (1st Cir. 2020) ....................................................................................... 20

Summers v. Earth Island Institute,
    555 U.S. 488 (2009) .......................................................................................... 2, 16, 19

Texas v. Lesage,
    528 U.S. 18, 21 (1999) ................................................................................................. 14

United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.,
    517 U.S. 544 (1996) ...................................................................................................... 19

United Steelworkers of America v. Weber,
    443 U.S. 193  (1979) ..................................................................................................... 32

Warth v. Seldin,
    422 U.S. 490 (1975) .......................................................................................... 11, 19, 20

Young Am.'s Found. v. Gates,
    560 F. Supp. 2d 39 (D.D.C. 2008) .......................................................................... 18

**Statutes**

42 U.S.C. §1981 ......................................................................................................................23

42 U.S.C. §2000d ............................................................................................................... 21, 23

42 U.S.C. §2000d-4a ..............................................................................................................21

42 U.S.C. §18116 .........................................................................................................21, 22, 23

D.C. Code §2-1402.11 ...................................................................................................... 30, 31

**Other Authorities**

*Professional Association, Black's Law Dictionary* (11th ed. 2019) ......................................31

**Treatises**

Restatement (Second) of Contracts §24 ................................................................................25

*Restatement (Second) of Contracts §71 ......................................................................... 25, 27

*Restatement (Second) of Contracts §346 .............................................................................29

## INTRODUCTION

Defendants, Health Affairs and Project HOPE, are running a racially discriminatory fellowship—the Health Equity Fellowship for Trainees—that categorically excludes white applicants. Plaintiff, Do No Harm, brought this lawsuit on behalf of its members to stop Defendants' unlawful discrimination. In response to Do No Harm's complaint, Defendants have relatively little to say. "For purposes of this motion only, … Defendants accept" most aspects of Do No Harm's allegations "as true" and only raise a few arguments relating to standing and the sufficiency of its pleading. Dkt. 26-1 at 10 & n.2.

Defendants' motion should be denied. Do No Harm sufficiently alleges that Defendants "impose rigid race requirements for applicants" that exclude Member A. Dkt. 24 at 7 (¶43). To be eligible for the Fellowship, an applicant must identify as American Indian/Alaskan Native, African American/Black, Asian American/Pacific Islander, and Hispanic Latino; those "who identify only as white do not meet" this requirement. Dkt. 24 at 8 (¶¶44-45). In other words, non-Hispanic whites are ineligible for the Fellowship, and Defendants have never accepted a fellow who identified as "white alone." Dkt. 24 at 8 (¶¶45, 49). In addition, as Do No Harm alleges, Member A is ineligible for the Fellowship because Member A is "white," "does not identify as any other race/ethnicity," and does not "identify as a member of Defendants' preferred racial and ethnic groups." Dkt. 24 at 10 (¶¶63-64). All of that must be accepted as true at this stage and, of course, states a plausible claim. Defendant's arguments for dismissal fail.

***First***, Do No Harm sufficiently alleges associational standing. Do No Harm alleges that it has at least one member (Member A) who has standing to bring this suit. Member A meets all non-racial criteria for the Fellowship and is "ready and able to apply to the Fellowship for the 2024 class and future classes if Defendants stop discriminating against white applicants." Dkt. 24 at 10 (¶66). Contrary to Defendants' assertion, under binding case law, Do No Harm need not allege that Member A

has applied or would have been accepted to the Fellowship to have standing. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015). Nor does Member A's anonymity pose a problem under *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), especially at the pleading stage, *Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021) (Moss, J.). The injuries suffered by Do No Harm's members—including their inability to compete on an equal footing—are directly traceable to Defendants' exclusionary policy. And this case does not require Do No Harm members' participation because Do No Harm is challenging a facially discriminatory policy and primarily seeks injunctive and declaratory relief.

***Second***, Do No Harm sufficiently stated claims under Title VI, §1557, §1981, and D.C. law. Defendants broadly assert that white applicants like Member A are not victims of discrimination because Defendants might not enforce their racially exclusive requirement if white applicants apply for the Fellowship. But this argument is not only untested, self-serving, and outside the four corners of the complaint, but also irrelevant: maintaining an eligibility requirement that excludes white applicants because they are white is the definition of discrimination. And binding precedent makes clear that "victims would not be limited to the few who ignored the [requirement] and subjected themselves to personal rebuffs." *Teamsters*, 431 U.S. at 365.

Defendants' attempt to evade §1981 is also unpersuasive. Contrary to Defendants' argument, the Fellowship *does* create a contractual relationship with the fellows. Defendants offer selected applicants a place in the Fellowship, including its workshops and seminars, publication opportunities, and "one year of free membership to *Health Affairs Insider* (worth about $180)," in exchange for applicants' participation and performing various required tasks. Dkt. 24 at 6-7, 12 (¶¶35, 83, 85). That's a contract—offer, acceptance, consideration—plausibly alleged at this stage.

Defendants' attempt to evade D.C. law is also unpersuasive. D.C. law is broad, defines an "employer" to include a "professional association," and prohibits discrimination by training programs. Contrary to Defendants, D.C. law covers training programs regardless of whether compensation awaits the trainees. And Do No Harm sufficiently alleges, based in part on Defendants' own previous concession, that the Fellowship is a training program.

Defendants' attempt to evade all civil-rights laws with passing arguments based on the First Amendment and Title VII is similarly unpersuasive. As an initial matter, they are too undeveloped and are thus forfeited. In any event, these arguments require detailed factual findings before they apply, which Defendants obviously lack at the pleading stage. And, even more critically, Defendants' arguments are foreclosed as a matter of law.

For all these reasons, Defendants' motion to dismiss should be denied.

## BACKGROUND

### A.   Project HOPE receives millions of dollars in federal funds and all of its operations are covered by Title VI and §1557.

Project HOPE is a U.S.-based tax-exempt 501(c)(3) nonprofit organization that "principally provides direct health care services, supplies, medicines, equipment, and training for healthcare professionals, and engages in healthcare policy discussions" throughout the United States and the rest of the world. Dkt. 24 at 3-4 (¶¶12, 18-21). By its own admission, Project HOPE provides direct healthcare services. Dkt. 24 at 4 (¶20). Project HOPE publishes Health Affairs, a highly prestigious, peer-reviewed healthcare journal that "explores health policy issues of current concern in domestic and international spheres." Dkt. 24 at 5 (¶22). "[W]ith 1,700 submissions annually, Health Affairs accepts only 10% of total submissions." Dkt. 24 at 5 (¶25). "Publication in Health Affairs is prestigious, as the journal is considered 'the bible of health policy.'" Dkt. 24 at 5 (¶¶24-25).

Project HOPE has received millions of dollars in federal funds over many years, in addition to its 501(c)(3) tax-exempt status. Dkt. 24 at 5 (¶26). These funds come from multiple federal agencies

like HHS, the State Department, and USAID. Dkt. 24 at 5-6 (¶¶26-29). Federal funds are extended to Project HOPE as a whole, and they go into Project HOPE's overall operating budget which Project HOPE uses to cover overhead and other facilities and administrative costs. Dkt. 24 at 6 (¶30).

**B.** **Project Hope and Health Affairs launch and oversee the Health Equity Fellowship for Trainees that excludes white applicants.**

In 2021, Defendants launched the Health Equity Fellowship for Trainees. Dkt. 24 at 6 (¶31). The Fellowship is part of Health Affairs' national initiative "'to advance racial equity in health policy and health services scholarly publishing.'" Dkt. 24 at 6 (¶32). Defendants' stated objective for the Fellowship "is to 'increase' the 'quantity of equity-related research published in *Health Affairs* authored by members of *racial and ethnic groups that have historically been underrepresented* in scholarly publishing." Dkt. 24 at 6 (¶34) (emphasis added). "Spots for the Fellowship are limited, and Defendants select no more than 10 fellows per year." Dkt. 24 at 7 (¶38).

Defendants provide numerous benefits to the selected fellows: one-on-one mentorship from published researchers and Health Affairs editorial staff "to increase the likelihood that the fellow's submitted manuscript will be accepted for publication in *Health Affairs* or another journal"; "[p]ubli-cation of at least one *Health Affairs Forefront* post relating to their subject area and/or experience with the fellowship"; one year of free membership to *Health Affairs Insider* (worth about $180); an oppor-tunity to serve as a brand advocate for Health Affairs; and expanded professional networks and en-gagements with other fellows and researchers. Dkt. 24 at 6-7, 12 (¶¶35, 83-87).

In exchange for these benefits, fellows are "'required to partake in workshops/seminars on publishing, peer-reviewing, research methods for racial health equity research, etc.'" and are "'required to publish at least one *Health Affairs* Forefront article relating to their subject area and/or experience with the Fellowship.'" Dkt. 24 at 7, 11 (¶¶36, 76-80). Defendants require a minimum of four hours of commitment every month from the fellows. Dkt. 24 at 7 (¶37). Fellows also agree not to make any false statements on their applications; to "grant" Defendants the right to conduct a background check;

to "release" from liability those involved in the background check; and to have a "medical examination prior to the commencement of *duties*." Dkt. 24 at 12-13 (¶¶89-90) (emphasis added). The fellows' promises to perform and complete the expected tasks in the Fellowship are induced by and given in exchange for Defendants' promises about the benefits of and participation in the Fellowship. Dkt. 24 at 11 (¶82). When fellows accept Defendants' offer of participation in the Fellowship, they do so because of the promised benefits. Dkt. 24 at 11 (¶82).

Likewise, Defendants bargain for the fellows' participation, time, manuscripts, and *Health Affairs Forefront* posts to advance *their own* goals. Dkt. 24 at 12 (¶87). Defendants created the Fellowship to increase "equity-related research published in *Health Affairs* authored by members of racial and ethnic groups that have historically been underrepresented in scholarly publishing," and the Fellowship is expressly designed to select highly qualified applicants whose participation in the Fellowship will "'increase the likelihood'" of "'publication in *Health Affairs* or another journal.'" Dkt. 24 at 12 (¶¶83, 88). And Defendants' goals are directly advanced by the requirement that fellows publish an article relating to "racial equity" or fellows' "'experience with the Fellowship.'" Dkt. 24 at 12 (¶88).

Defendants completely exclude non-Hispanic white applicants from the Fellowship. Dkt. 24 at 7 (¶43). Defendants' eligibility requirements state that, "'[t]o be eligible for Health Affairs' Health Equity Fellowship for Trainees, [an applicant] *must* … [i]dentify as American Indian/Alaskan Native, African American/Black, Asian American/Pacific Islander, and Hispanic/Latino.'" Dkt. 24 at 8 (¶44) (emphasis added). Students and researchers who identify only as white do not meet Defendants' race-based eligibility criterion to apply to the Fellowship. Non-Hispanic/Latino whites are ineligible. Dkt. 24 at 8 (¶¶45-46). The racial requirement is listed on a bullet-point list and described as a matter of "'eligib[ility]' that 'must' be satisfied." Dkt. 24 at 8 (¶48). Defendants insist that the other requirements on that same list—minimum education and research interests—are in fact requirements. Dkt. 24 at 8 (¶48). And Defendants' race requirement is rigidly enforced. Dkt. 24 at 7 (¶43). Defendants have never

selected a fellow who identifies as white alone. *See* Dkt. 24 at 8 (¶49). Defendants' expressed goal—to increase the quantity of "research published in the journal by" non-whites—reveals an intent to exclude whites, fill up as many slots as possible with non-whites before admitting any whites, use facially exclusionary requirements to deter whites from applying, or do all three. Dkt. 24 at 8 (¶50).

Defendants impose other criteria for the fellowship. To be eligible, an applicant must be a graduate-level (doctoral) student, postdoctoral researcher, or early career researcher who is no more than seven years outside of having earned the graduate degree. Dkt. 24 at 7 (¶39). The applicant must also be engaged in health-services research that advances racial health equity among historically marginalized populations and working on a research project that is within one year of being submitted for publishing. Dkt. 24 at 7 (¶40). But unlike the rigidly enforced race requirement, the Fellowship does not exclude applicants merely because they have not extensively engaged in health equity research. Dkt. 24 at 7 (¶41). Defendants accept applicants who are willing to expand their research to racial health equity, including by participating in the Fellowship. Dkt. 24 at 7 (¶41). For example, one of the fellows in the 2022 class has a background in education policy, studies gang violence, and is a tenure-track faculty member at the school of education at a private university. Dkt. 24 at 7 (¶42).

The Fellowship's racial and non-racial eligibility requirements have not changed since its launch. Dkt. 24 at 6 (¶32). The 2024 class of fellows will be selected in 2023. Dkt. 24 at 6 (¶32).

### C.    Do No Harm has members who are ineligible to apply to the Fellowship on account of race.

Do No Harm is a nationwide membership organization consisting of a diverse group of physicians, healthcare professionals, medical students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies, including the recent rise in explicit racial discrimination in graduate and postgraduate medical programs. Dkt. 24 at 3 (¶7). Do No Harm accomplishes its mission through education and advocacy and by drawing attention to the divisive and

discriminatory ideas being embedded within medical education, training, research, practice, and policy. Dkt. 24 at 3 (¶8).

Do No Harm has identified at least one member who is being harmed by Defendants' racially exclusionary Fellowship. Dkt. 24 at 3 (¶9). Member A is currently a research fellow at a think tank. Dkt. 24 at 9 (¶55). Member A received a Ph.D. in 2019 and completed postdoctoral work in 2020 from top public and private universities with rigorous research and multidisciplinary programs. Dkt. 24 at 9 (¶56). Member A is a qualified and serious researcher whose health-policy research has been cited by major national print media outlets. Dkt. 24 at 9 (¶59).

Member A has a demonstrated interest in the kind of research with which the Fellowship is concerned. Member A currently has ongoing (and years-long) research projects relating to race-equity issues. Dkt. 24 at 9 (¶60). Member A's past research has addressed regulatory barriers that disproportionately affect and disadvantage racial minorities. Dkt. 24 at 9 (¶57). One of Member A's ongoing research topics concerns issues of race and equity in public health. Dkt. 24 at 9 (¶58). For example, Member A has critiqued, on race and health-equity grounds, the methodology employed in a recently published paper concerning COVID-19. Dkt. 24 at 9 (¶58). Member A wishes to pursue research and publish in a journal on topics related to race equity because Member A cares about the issue and because being published in a peer-reviewed journal is an important professional milestone. Dkt. 24 at 9 (¶61). Member A meets all nonracial criteria for applying to the Fellowship. Dkt. 24 at 9 (¶62).

Nevertheless, Defendants' eligibility requirements exclude Member A because of his race and ethnicity. Dkt. 24 at 10 (¶64). Member A is white and does not identify as any other race/ethnicity. Dkt. 24 at 10 (¶63). Member A wants his application to be treated fairly under non-racial criteria and does not wish to make a futile gesture by submitting an application while Defendants maintain a racially exclusionary criterion against white applicants. Dkt. 24 at 10 (¶65). Member A is ready and

able to apply to the Fellowship for the 2024 class and future classes if Defendants stop discriminating against white applicants. Dkt. 24 at 10 (¶66); *see also* Dkt. 24 at 10, 17 (¶¶65, 132).

## STANDARD OF REVIEW

"In deciding a 12(b)(6) motion, a court construes the complaint liberally in the plaintiff's favor, accepting as true all of the factual allegations contained in the complaint with the benefit of all reasonable inferences from the facts alleged." *Aktieselskabet AF 21 Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) (cleaned up). "In assessing a Rule 12(b)(6) motion, a court may consider only 'the facts contained within the four corners of the complaint.'" *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 186 (D.D.C. 2022).

The same is true "[w]hen reviewing a standing challenge," especially a facial challenge, under Rule 12(b)(1). *Chavous v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 154 F. Supp. 2d 40, 44-45 (D.D.C. 2001). A "facial challenge" to jurisdiction "asks whether the complaint alleges facts sufficient to establish the court's jurisdiction." *Ranchers-Cattlemen*, 573 F. Supp. 3d at 332. In this posture, the Court "must accept the factual allegations of the complaint as true" as it would under Rule 12(b)(6). *Id.* Here, Defendants bring a facial challenge to "standing allegations" by "repeatedly argu[ing] that [Do No Harm] has failed to *allege* standing." *Id.* at 333 (cleaned up); *see also Ctr. for Biological Diversity*, 597 F. Supp. 3d at 189 (treating a standing challenge as facial when Florida challenged the "sufficiency of Plaintiffs' allegations as they relate to standing" by referring to Plaintiffs' "alleged" theory of violation). Defendants argue that "[b]ased on the facts alleged in the Amended Complaint, [Do No Harm] lacks standing …." Dkt. 26-1 at 10; *see also id.* at 13 ("Based on the allegations in the Complaint, … [Do No Harm] cannot make that showing [for standing]."). And Defendants repeatedly rely on what "[Do No Harm] alleges." Dkt. 26-1 at 12.

## ARGUMENT

The Court should deny Defendants' motion to dismiss. Do No Harm has plausibly alleged standing and claims upon which relief can be granted.[1]

## I.   Do No Harm has associational standing.

"An organization can assert associational standing on behalf of its members if" it can establish three elements. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019). First, the organization must establish that "'at least one of [its] members has standing to sue in her or his own right.'" *Id.* Second, "'the interests the association seeks to protect'" must be "'germane to its purpose.'" *Id.* And third, "'neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *Id.* Defendants dispute only the first and third elements. *See* Dkt. 26-1 at 11. Do No Harm satisfies all three.

### A.   Member A would have standing on his own.

Do No Harm adequately alleges Member A's standing. Member A has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Standing is assessed "with the manner and degree of evidence required at the success[ive] stages of litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage," even "general factual allegations of injury resulting from the defendant's conduct" are sufficient. *Id.* Do No Harm's allegations regarding Member A easily clear that low bar. And contrary to Defendants' argument, Do No Harm does not need to name names to survive a motion to dismiss. *See, e.g.*, *NAACP v. Trump*, 298 F. Supp. 3d 209, 225-26 & n.10 (D.D.C. 2018) (rejecting challenge to standing based on an anonymous member); *see also Ranchers-Cattlemen*, 573 F. Supp. 3d at 332 (same).

---

[1] Defendants also ask this Court to *preemptively* deny leave to amend the complaint as futile. Dkt. 26-1 at 16. It should not. Leave to amend must be "'freely given,'" *Foman v. Davis*, 371 U.S. 178, 182 (1962), so this Court should not resolve a motion for leave to amend before Do No Harm even files one.

**1.** Member A is injured because Defendants' eligibility criteria are a "discriminatory classification [that] prevent[s]" Member A "from competing on an equal footing in [his or her] quest for a benefit." *Ne. Fla.*, 508 U.S. at 667; *see also Shea*, 796 F.3d at 50 ("[A] plaintiff may claim an injury in fact from the purported denial of the ability to compete on an equal footing against other candidates for a job."); *Moore v. U.S. Dep't of Agric.*, 993 F.2d 1222, 1224 (5th Cir. 1993) ("The badge of inequality and stigmatization conferred by racial discrimination is a cognizable harm in and of itself providing grounds for standing."); *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S.Ct. 1009, 1016 (2020) (observing that Section 1981 protects the right to have "the same opportunity to enter into contracts" regardless of race (cleaned up)). Do No Harm sufficiently alleges that Defendants "impose rigid race requirements for applicants" that harm Member A. Dkt. 24 at 7 (¶43). As alleged, to be eligible to apply to the Fellowship, an applicant *must* identify as American Indian/Alaskan Native, African American/Black, Asian American/Pacific Islander, and Hispanic Latino, and white students and researchers "who only identify as white do not meet" this requirement. Dkt. 24 at 8 (¶¶44-45). In other words, Do No Harm alleges that non-Hispanic whites are ineligible for the Fellowship and that Defendants have never accepted a fellow who identified as "white alone." Dkt. 24 at 8 (¶¶45, 49). In addition, Do No Harm alleges that Member A is ineligible for the Fellowship because Member A is "white," "does not identify as any other race/ethnicity," and does not "identify as a member of Defendants' preferred racial and ethnic groups." Dkt. 24 at 10 (¶¶63-64). In sum, Do No Harm adequately alleges that Member A cannot compete for a spot in the Fellowship on an equal footing because of his race. *See* Dkt. 24 at 9-10 (¶¶62-66).

Contrary to Defendants' argument, Do No Harm was not required to allege that Member A previously applied to the Fellowship. *See* Dkt. 26-1 at 11-12. Circuit precedent makes clear that an affected individual simply needs to "posses[s] an intent to apply" once the discriminatory policy ends.

*Shea*, 796 F.3d at 50. The affected individual "has standing to challenge" a racially discriminatory program "notwithstanding his failure to apply." *Id.* at 51. This principle reflects the commonsense notion that "a plaintiff need not translate his or her desire for a job into a formal application where that application would be a merely futile gesture." *Carney v. Adams*, 141 S.Ct. 493, 503 (2020) (cleaned up). And it reflects the reality that "the effects of and the injuries suffered from discriminatory . . . practices are not always confined to those who were expressly denied a requested … opportunity." *Teamsters*, 431 U.S. at 365. As the Supreme Court has explained, "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Id.* Member A "is as much a victim of discrimination as is he who goes through the motions of submitting an application" even though Member A did not "engage in a futile gesture." *Id.* As Do No Harm alleges here, "Member A wants his or her application to be treated fairly under non-racial criteria." Dkt. 24 at 10 (¶65). Member A currently "does not wish to make a futile gesture by submitting an application while Defendants maintain a racially exclusionary criterion against white applicants," *id.*, especially when Defendants' race requirements have been rigidly enforced in the past, *see* Dkt. 24 at 7-8 (¶¶43-50).

Defendants' citation of *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), is unavailing. The injury here—inability to compete on an equal footing—was not at issue there, where Moose Lodge's "policies with respect to serving guests" meant that a black guest was not served. *Id.* at 166-67. The plaintiff challenged "the lodge's membership requirements," but the guest "was not injured by Moose Lodge's membership policy since he never sought to become a member." *Id.* Here, Member A wants to apply—but on an equal footing, Dkt. 24 at 10, 17 (¶¶65-66, 132)—and his intention to apply after the racially exclusive criteria are eliminated is all that is required because his injury is an inability to compete on an equal footing, *see, e.g.*, *Gratz*, 539 U.S. at 262. Defendants' reliance on *Warth v. Seldin*, 422 U.S. 490 (1975), to cabin this principle was expressly rejected by the Supreme Court in *Northeastern*

*Florida. See Ne. Fla.*, 508 U.S. at 667-68. There, the Court explained that "*Warth* did not involve an allegation that some discriminatory classification prevented the plaintiff from competing on an equal footing in its quest for a benefit." *Id.* at 667. By contrast, this case involves exactly that allegation. So, as in *Northeastern Florida*, "this case is governed by" cases that acknowledge that, "[t]o establish standing, … party challenging a … program … need only demonstrate that it is able and ready to" apply or bid "and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666-67.[2]

Alternatively, Do No Harm alleges that Member A "is able and ready" to apply to the Fellowship "and that a discriminatory policy prevents [him or her] from doing so on an equal basis," which also satisfies standing. *Ne. Fla.*, 508 U.S. at 666; *see also Gratz*, 539 U.S. at 262 (a plaintiff satisfies standing by stating that he or she is "'able and ready' to apply" when the discriminatory policy is invalidated). Do No Harm alleges just that: Member A "is ready and able to apply once Defendants stop discriminating." Dkt. 24 at 10 (¶65). As alleged, Member A currently has "ongoing (and years-long) research projects relating to race-equity issues" and even "has submitted articles to Health Affairs in the past." Dkt. 24 at 9 (¶60). Member A's past research "has addressed regulatory barriers that disproportionately affect and disadvantage racial minorities" and now "wishes to pursue research and publish in a journal … because Member A cares about the issue" and because "being published in a

---

[2] Defendants' assertion that they "made Plaintiff aware … that prior fellows have identified as white or selected 'prefer not to disclose' on their application" is irrelevant. Dkt. 26-1, at 12 n.3. This Court cannot look outside the four corners of the complaint or credit a defendant's blanket assertion that it isn't doing what it's been accused of. At this stage, the Court must accept the complaint's factual allegations as true. *Ranchers-Cattlemen*, 573 F. Supp. 3d at 332. Here, Do No Harm sufficiently alleged that Defendants totally exclude applications who identify as "white alone." Dkt. 24 at 8 (¶¶45, 49). But even if Defendants had admitted white applicants in the past *despite* the eligibility criteria, the fact that Defendants maintain such facially race-based criteria is illegal and still establishes that Member A is unable to compete on an equal footing with non-white applicants. *See, e.g., Baldwin v. Morgan*, 287 F.2d 750, 752 (5th Cir. 1961) (a railroad terminal liable for racial discrimination for maintaining segregated waiting rooms and posting signs even though it did not "coercively compe[l]" the segregated use); *Lewis v. Greyhound Corp.*, 199 F. Supp. 210, 214 (M.D. Ala. 1961) (bus carriers liable for segregated facilities and posting signs even though the carriers were "not enforcing segregation"). In all events, Defendants' point ignores that Do No Harm alleged that "[*n*]on-Hispanic/Latino whites are ineligible," Dkt. 24 at 8-9 (¶¶45-49), and Member A is non-Hispanic/Latino white, Dkt. 24 at 10 (¶¶63-64).

peer-reviewed journal is an important professional milestone." Dkt. 24 at 9 (¶¶57, 60). And Member A wishes to "take advantage of" "numerous benefits—like the mentorship with published researchers and journal staff, professional connections, and other opportunities and benefits." Dkt. 24 at 9 (¶60). Contrary to Defendants' erroneous description that its allegations are "conclusory" and "self-serving," Dkt. 26-1 at 12, Do No Harm made specific and "concrete" allegations that show Member A is able and ready to apply and thus has standing, *Carney*, 141 S.Ct. at 502.

Defendants also concede that Do No Harm did not need to allege that "Member A would ultimately have been *selected*." Dkt. 26-1 at 13. Nevertheless, they incorrectly suggest that Member A lacks standing because Do No Harm failed to "show that Member A is otherwise eligible and qualified to be considered" for the Fellowship. Dkt. 26-1 at 13 (cleaned up). As a threshold matter, Do No Harm *does* allege that "Member A meets all nonracial criteria for applying to the Fellowship" except for the race requirement. Dkt. 24 at 9. Member A "received a Ph.D. in 2019 and completed postdoctoral work in 2020" from universities with "rigorous research and multidisciplinary programs." Dkt. 24 at 9 (¶56); *see also* Dkt. 24 at 7 (¶39) (requiring an applicant to be a "graduate-level (doctoral) student, postdoctoral researcher, or early researcher"). Member A is also "engaged in health services research that advances racial health equity among historically marginalized populations" and "[w]orking on a research project that is within one year of being submitted." Dkt. 24 at 7 (¶40). Member A's "past research has addressed regulatory barriers that disproportionately affect and disadvantage racial minorities" and "has critiqued, on race and health-equity grounds, the methodology employed in a recently published paper concerning COVID-19." Dkt. 24 at 9 (¶¶57-58).

The allegations concerning Member A's experience are substantial and more significant than the experience of some of the past fellows. For instance, as Do No Harm alleges, Defendants do "not exclude applicants merely because they have not extensively engaged in racial health equity research" so long as the applicant is "willing to expand [his or her] research." Dkt. 24 at 7 (¶41). Indeed, Do No

Harm alleges that "one of the fellows in the 2022 class had a background in education policy, studies gang violence, and is a tenure-track faculty member at the school of education at a private university," Dkt. 24 at 7 (¶42)—demonstrating *less* previous interest in the relevant research category than Member A. Those "factual allegations" must be "accept[ed] as true," and they are more than enough for the Court to draw the "reasonable inference[ ]" that Member A is engaged in the relevant research. *Fame Jeans*, 525 F.3d at 15 (cleaned up).[3]

In addition, binding precedent forecloses Defendants' attempt to challenge Member A's standing based on his supposed lack of nonracial qualifications. As the D.C. Circuit has made it clear, "[b]ecause the injury lies in the denial of an equal *opportunity* to compete," courts "do not inquire into the plaintiff's qualifications (or lack thereof) when assessing standing." *Shea*, 796 F.3d at 50 (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-81 & n.14 (1978)); *see also Texas v. Lesage*, 528 U.S. 18, 21 (1999) ("[A] plaintiff who challenges an ongoing race-conscious program and seeks forward-looking relief need not affirmatively establish that he would receive the benefit in question if race were not considered. The relevant injury in such cases is 'the inability to compete on an equal footing.'"). Defendants cannot meaningfully distinguish *Shea*. Defendants assert that "the officer [in *Shea*] was at least qualified to apply," and Member A is not otherwise qualified. Dkt. 26-1 at 13-14. Setting aside the fact that Do No Harm sufficiently alleges that Member A meets all nonracial requirements, Defendants cannot avoid the unambiguous rule from *Shea*: "we do not inquire into the plaintiff's qualifications (or lack thereof) when assessing standing." 796 F.3d at 50.

---

[3] The Court should disregard Defendants' assertion that Member A "failed to allege that he or she is participating in research that would *advance* racial health equity." Dkt. 26-1 at 13 n.4. The complaint must be construed liberally in Do No Harm's favor at this stage. And challenging bad research methodologies "on race and health-equity grounds," as Member A has done, of course advances health equity. Dkt. 24 at 9 (¶¶57-61).

**2.** Defendants' arguments against causation and redressability also fail. Dkt. 26-1 at 14. Because an injunction and declaratory judgment in Do No Harm's favor would require Defendants to stop discriminating based on race, Member A's injury "is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338*; see also Ne. Fla.*, 508 U.S. at 666 & n.5 (explaining that "it follows" directly from the inability to compete on an equal footing that a plaintiff "has sufficiently alleged that the [challenged program] is the 'cause' of its injury and that a judicial decree directing the [defendant] to discontinue its program would 'redress' the injury").

Contrary to Defendants' assertion that there are too many "links in the chain of causation between the challenged … conduct and the asserted injury," Dkt. 26-1 at 14 (quoting *Allen v. Wright*, 468 U.S. 737, 759 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)), there is just one link, *see Ne. Fla.*, 508 U.S. at 666 & n.5: Defendants' racially exclusive eligibility criterion that directly denies Member A "an equal *opportunity* to compete," *Shea*, 796 F.3d at 50. Defendants also argue that Member A's injury is self-inflicted because of Member A's "own choice not to apply to [the Fellowship]." Dkt. 26-1 at 14. But as addressed above, both Supreme Court and the D.C. Circuit decisions foreclose that argument. *See Gratz*, 539 U.S. at 261-62; *Shea*, 796 F.3d at 50. "By choosing not to apply because the [Defendants] w[ere] considering race during the time of his application process, [Member A] did exactly what [the would-be applicant in *Gratz*] allege[s] he would do: refuse to apply through the race-conscious program unless and until the program's use of race-conscious preferences ceased." *Shea*, 796 F.3d at 50. "As a result," Member A "has standing to challenge [Defendants']" program "notwithstanding [Member A's] failure to apply." *Id.* at 50-51.

Defendants also assert that "there is nothing for the Court to redress" because there is no "allegation that [Member A] will be injured in the next fellowship application cycle" and because "the [Fellowship's] application period has closed." Dkt. 26-1 at 14. However, Do No Harm alleges that "Member A is ready and able to apply for the Fellowship for the 202**4** class and future classes if

Defendants stop discriminating against white applicants." Dkt. 24 at 10 (¶66) (emphasis added). And as Do No Harm alleges, "the Fellowship's eligibility requirements have not changed since its launch. The 2024 class of fellows will be selected in 2023." Dkt. 24 at 6 (¶32). Furthermore, as alleged, "Defendants intend to retain these racial preferences in their criteria for the Fellowship." Dkt. 24 at 9 (¶52). A favorable ruling will ensure that Member A is able to compete on an equal footing next year.[4]

**3.** Nor does Member A's anonymity pose a problem, especially at the pleading stage. Contrary to Defendants' assertions, *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), does not require Do No Harm to "name the individuals who were harmed by the challenged program," Dkt. 26-1 at 11, at the pleading stage. *Summers* was at a summary-judgment case. *See* 555 U.S. at 498-99. Defendants' argument that associations must identify their members by name is plainly untrue at this stage, where courts "'presume'" that "'general factual allegations about standing embrace those specific facts that are necessary.'" *Ranchers-Cattlemen*, 573 F. Supp. 3d at 335 (Moss, J.) (quoting *Lujan*, 504 U.S. at 561). As explained above, Defendants are raising a facial challenge to standing. *Supra* 8. An associational plaintiff "can survive a facial challenge to its standing without identifying specific, injured members by name in its complaint." *Ranchers-Cattleman*, 573 F. Supp. 3d at 336; *see also Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006) ("[T]he defendants cite to no authority— nor are we aware of any—that supports the proposition that an association must 'name names' in a complaint in order to properly allege injury in fact to its members."); *Hancock Cnty. Bd. of Sup'rs v. Ruhr*,

---

[4] To the extent that Defendants intended to argue mootness by arguing that the 2023 application window has closed, *see* Dkt. 26-1 at 14, that argument would be wrong. Do No Harm amended its complaint and included allegations regarding the 2024 application cycle. Do No Harm alleges that Member A intends to apply to the 2024 class of fellows if Defendants stop discriminating and that Defendants will select the 2024 class in 2023. Dkt. 24 at 6 (¶32). Do No Harm further alleges that Defendants will retain the same race requirements for the 2024 class based on their past conduct. Dkt. 24 at 8 (¶¶48-51). This case is live. *See A.N.S.W.E.R. Coal. v. Kempthorne*, 493 F. Supp. 2d 34, 44-47 (D.D.C. 2007) (holding that challenge to policies affecting organization's ability to protest not moot despite end of 2005 inaugural parade because of organization's expressed "intent to protest at the next Inauguration" and reasonable expectation that it will be subject to same policies in the future).

487 F. App'x 189, 198 (5th Cir. 2012) ("We are aware of no precedent holding that an association must set forth the name of a particular member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based on a lack of associational standing."). Here, Do No Harm sufficiently alleges that at least one of its members suffered harm because of Defendants' race-based requirement. *See* Dkt. 24 at 9-10 (¶¶53-66). These allegations must be accepted as true and are sufficient to establish its standing at this stage.

Even at the summary-judgment stage, *Summers* does not require associations to identify specific members by name in every case. In *Summers*, the associations did not identify any member but instead argued that, given the sheer size of their membership, there was a "statistical probability" that they had at least one member with standing. 555 U.S. at 497. The Court rejected this theory of "probabilistic standing." *Id.* at 499. Because the association did not identify any specific members, the Court could not verify the key facts needed to evaluate standing: it did not know whether any member "will ever visit one of the small parcels at issue." *Id.* Do No Harm does not have this problem; it identified a specific member and included specific allegations that he is white, meets all nonracial requirements, is able and ready to apply, and is nevertheless ineligible on account of his race. *See* Dkt. 24 at 9-10 (¶¶53-66). Defendants' "argument places undue emphasis on language requiring plaintiff associations to 'identify' or 'name' members." *FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 286 (D.N.J. 2003) (holding that an association of law schools could keep its members secret without losing standing), *aff'd in relevant part*, 390 F.3d 219, 228 n.7 (3d Cir. 2004), *aff'd in relevant part*, 547 U.S. 47, 52 n.2 (2006). That language "goes not to a blanket rule that associations … must identify their membership, but rather to whether the factual allegations in a given context sufficiently demonstrate that an association indeed has members that have suffered an injury-in-fact." *Id. Summers* was simply an application of the general rule "that a plaintiff must prove 'facts sufficient to establish that one or more of its members has suffered, or is threatened with, an injury,'" but that rule can be satisfied in many cases "even as to

those members whom [the plaintiff] does not identify by name." *New York v. U.S. Dep't of Com. (Census Case)*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019), *aff'd in relevant part*, 139 S. Ct. 2551, 2565-66 (2019).

Moreover, Do No Harm did identify Member A by name. Pseudonyms are still names, after all. And the law does not require associations to publicly disclose their members' *actual* name to establish Article III standing. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114, 1118-1124 (11th Cir. 2022) (holding that organization had standing to sue on behalf of pseudonymously named "Student A," "Student B," and "Student C"); *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Sup'rs*, 522 F.3d 796, 802 (7th Cir. 2008) ("[Associational standing] still allows for the member on whose behalf the suit is filed to remain unnamed by the organization."); *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (same); *Young Am.'s Found. v. Gates*, 560 F. Supp. 2d 39, 49-50 (D.D.C. 2008) (not requiring the member's actual name in assessing injury-in-fact), *aff'd*, 573 F.3d 797 (D.C. Cir. 2009); *Am's Health Ins. Plans v. Hudgens*, 915 F. Supp. 2d 1340, 1351 n.13 (N.D. Ga. 2012) ("[An association] may assert standing on behalf of its members without identifying them."); *NRDC v. Mineta*, 2005 WL 1075355, at *5 (S.D.N.Y. May 3, 2005) ("'no absolute requirement that individual members be identified.'"). This rule makes sense because associations and their members have a First Amendment right to keep their membership anonymous. *AFPF v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)). The mere addition of their names would serve no Article III purpose. *See Census Case*, 351 F. Supp. 3d at 606 n.48 (member's "name" was "unnecessary to determine … Article III standing"). But it could chill civil-rights challenges by inviting retaliation and undermining a "fundamental purpose of the associational standing doctrine – namely, protecting individuals who might prefer to remain anonymous." *Id.*; *see also NAACP*, 298 F. Supp. 3d at 225-26 ("anonymous affidavit[s]" from DACA-recipient members were sufficient for associational standing); *FAIR*, 291 F. Supp. 2d at 286 ("FAIR membership is kept secret to allay members' fears of retaliatory efforts on

behalf of … private actors if the law schools were to participate as named plaintiffs in a legal chal-lenge."). The associations in *Summers* did not identify any specific members—by pseudonym or oth-erwise. *See Summers*, 555 U.S. at 497-98. So *Summers* could not have passed on the well-established practice of associations using pseudonyms to protect their members. *See Census Case*, 351 F. Supp. 3d at 606 n.48 (explaining that *Summers* is at most "[d]icta" on this point).

### B.     The interests Do No Harm seeks to protect are germane to its purpose.

The interests Do No Harm "'seeks to protect are germane to its purpose.'" *Elec. Priv. Info. Ctr.*, 928 F.3d at 101. Do No Harm is a nationwide membership organization consisting of a diverse group of physicians, healthcare professionals, medical students, patients, and policymakers who want to pro-tect healthcare from a radical, divisive, and discriminatory ideologies, "including the recent rise in explicit racial discrimination in graduate and postgraduate medical programs." Dkt. 24 at 3 (¶7). The interests Do No Harm "seeks to protect here"—protecting its members' interests in not being subject to racial classifications in medical fellowships and programs—"are germane to the organization's broad purposes." *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 88 (3d Cir. 1991) (Alito, J.). Defendants do not dispute this prong.

### C.     The participation of Member A is unnecessary.

Neither Do No Harm's claims nor the relief it requests "'requires participation of an individual member in the lawsuit.'" *Elec. Priv. Info. Ctr.*, 928 F.3d at 101. Courts have repeatedly held that "'indi-vidual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996); *see also Warth*, 422 U.S. at 515 (explaining that associational standing "depends in substan-tial measure on the nature of the relief sought," and that if "the association seeks a declaration, injunc-tion, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Greater Bir-*

*mingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1316–17 & 29 (11th Cir. 2021) (explaining that individual participation was not required for equal protection claim and prospective injunctive relief); Dkt. 24 at 18-19 (Prayer for Relief) (seeking declaratory and injunctive relief). And individual participation is even less necessary for Do No Harm's claims because Defendants' eligibility criteria racially discriminate on their face. *Cf. Comm. for Effective Cellular Rules v. F.C.C.*, 53 F.3d 1309, 1315 (D.C. Cir. 1995) (holding that an organization has standing because "the claim made by the [organization] and the relief that it seeks—respectively a broad facial challenge to the *Second Report and Order* and vacatur thereof—do not require the participation of individual members").

Defendants suggests that Do No Harm cannot show standing "if Member A cannot prove … that he or she otherwise meets the requirements," *see id.*, but such proof is unnecessary for standing or for the remedies that Do No Harm seeks. *See, e.g., Shea*, 796 F.3d at 50; *supra* 14. Indeed, the court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, found the third *Hunt* factor satisfied, even though the membership association there challenged Harvard's highly individualized admissions process. 261 F. Supp. 3d 99, 110 (D. Mass. 2017), *aff'd* 980 F.3d 157 (1st Cir. 2020), *cert. granted* 142 S.Ct. 895 (2022). Here, as in *Harvard*, what controls is the fact that "the injunctive and declaratory relief requested need not be tailored to or require any individualized proof from any particular member." *Id.* Even if "certain individual members … may need to provide testimony and other evidence to establish" standing later, "the Supreme Court has made clear that *Hunt*'s third prong is satisfied" if "the nature of the claim and of the relief sought" does not make the individual participation of "each injured party indispensable to proper resolution of the cause." *Equal Rts. Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010) (quoting *Warth*, 422 U.S. at 511).

## II.     Do No Harm has stated claims against Defendants under Title VI, §1557, §1981, and the DC law.

Defendants do not contest most aspects of Do No Harm's claims. Defendants expressly "accept [Do No Harm's] allegations … as true," Dkt. 26-1 at 10, and only raise a few challenges. Those arguments fail.

### A.     Do No Harm has stated claims under Title VI and §1557 by alleging that its members are excluded from the Fellowship based on race.

Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. Under Title VI, as amended, "the term 'program or activity' and the term 'program' mean *all of the operations* of … an entire corporation": (i) "if assistance is extended to such corporation … as a whole" or (ii) if the corporation "is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." 42 U.S.C. §2000d-4a(3)(A)(i)-(ii) (emphasis added). Section 1557 of the Affordable Care Act similarly prohibits racial discrimination. It states that "[a]n individual shall not, on the ground prohibited under title VI … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance." 42 U.S.C. §18116(a). Title VI—and, by extension, §1557—are "coextensive with the Equal Protection Clause," which means that the challenged policy is reviewed under strict scrutiny. *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harv. Coll.*, 980 F.3d 157, 185 (1st Cir. 2020).

For purposes of their motion to dismiss, Defendants do not contest most of this. They concede that they must comply with Title VI and §1557. *See* Dkt. 26-1 at 10 n.2 (stating that "[f]or purposes of this motion only, … Defendants accept allegations" relating to federal funding and provision of healthcare services "as true"); *see also* Dkt. 24 at 15-16 (¶¶105-07, 118-21) (alleging that Defendants are covered by Title VI and §1557). They also do not expressly dispute Do No Harm's allegations that

their exclusion of white applicants is intentional and racially discriminatory on its face. *See* Dkt. 24, at 15-16 (¶¶108-10, 122). Nor do Defendants attempt to argue that their discriminatory requirement, under the facts alleged, would satisfy strict scrutiny. *See* Dkt. 24, at 15-16 (¶¶110-12, 123). Because Defendants do not raise these arguments, the Court should not reach them. *See Armeninan Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 191 (D.D.C. 2013) (observing that the movant "forfeited [the] argument by failing to raise it in their initial motion").

Instead, Defendants narrowly argue that the Title VI and §1557 claims fail because "Member A has never experienced discrimination in connection with [the Fellowship] because he or she has not applied to or been rejected from the fellowship." Dkt. 26-1 at 15. That argument badly misstates the facts (taken as true from the complaint) and law. Maintaining a racially exclusionary requirement that excludes an entire group of applicants based on race *is* itself a discriminatory act under Title VI and §1557. *See* 42 U.S.C. §2000d (prohibiting "exclu[sion]" of individuals from "any program or activity receiving Federal financial assistance" based on race); *accord* §18116. Do No Harm alleges that the Fellowship maintains "rigid race requirements" and excludes white applicants because they are white. Dkt. 24, at 7-8, 15-16 (¶¶43-51, 64-65, 108-10, 122). Such a race-based exclusion of white applicants is the type of action that "Title VI would guard against." *Stafford v. Geo. Wash. Univ.*, 2019 WL 237333, at *9 (D.D.C. June 5, 2019).

Any argument that Title VI and §1557 require Do No Harm to allege more (like the denial of formal applications by its members) not only repeats Defendants' unpersuasive standing argument but also is foreclosed by precedent. For example, in *Gratz*, the Court disagreed that the plaintiff was required to apply "'for admission as a transfer student.'" 539 U.S. at 261-62; *see also id.* at 260-61 ("[W]hether [the plaintiff] 'actually applied' for admission as a transfer student is not determinative of his ability to seek injunctive relief in this case."). The Court held that the University's racial discrimination violated Title VI, the Equal Protection Clause, and §1981 based on the allegation that "the

University had denied him the opportunity to compete for admission on an equal basis" and the University's failure to satisfy strict scrutiny. *Id.* at 262; *see also id.* at 275-76 & n.23. In short, the fact that Defendants "announce [their] policy of discrimination by a sign reading '[non-]Whites Only'" does not mean that their "victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Teamsters*, 431 U.S. at 365; *see also id.* at 365-67 (rejecting the argument that a formal application and rejection are required before relief can be given). Defendants' intentional racial criterion "exclude[s]" Member A "from participation in" the Fellowship "on the ground of race." 42 U.S.C. §2000d; *see also* §18116(a).[5]

### B.    Do No Harm has stated a claim under §1981 because Defendants do not offer white applicants the same opportunity to enter into contractual relationships.

Do No Harm sufficiently alleges a §1981 claim. *See* Dkt. 24, at 10-14 (¶¶67-99). "All persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws … as is enjoyed by white citizens." 42 U.S.C. §1981(a). The Supreme Court has interpreted §1981 to "protec[t] the equal right of all persons … without respect to race." *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 298 (1976) (Section 1981 "was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race."). Under §1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right," such as the right to make and enforce contracts. *Comcast Corp*, 140 S.Ct. at 1019.

Defendants contest the sufficiency of the §1981 claim by arguing that (1) Do No Harm failed to allege that its members ever applied and were denied acceptance to the Fellowship for race-based

---

[5] Defendants unpersuasively cite *Hollander v. Sears, Roebuck & Co.*, 450 F. Supp. 496, 504 (D. Conn. 1978), for the proposition that a plaintiff cannot "claim that he was excluded from a group he did not seek to join." For one, this statement is inconsistent with *Teamster* and *Gratz*. For another, Member A *does* seek to apply to the Fellowship if the discrimination stops.

reasons and (2) the Fellowship "does not create a contractual relationship with fellows." Dkt. 26-1 at 18. Neither argument is persuasive.

**1.** Do No Harm stated a §1981 claim by alleging that Defendants deny white applicants the "same right … to make and enforce contracts" because of their race. §1981(a). Section 1981 prohibits "a private offeror" from "refus[ing] to extend" to a racial group "the same *opportunity* to enter into contracts as he extends to" others. *Comcast Corp.*, 140 S.Ct. at 1016 (emphasis added). "An equal 'right … to make contracts' is an empty promise without equal opportunities to present or receive offers." *Id.* at 1020 (Ginsburg, J., concurring in part and concurring in the judgment) (cleaned up). Do No Harm alleges that Defendants maintain "rigid race requirements," Dkt. 24 at 7 (¶43), that applicants "'must'" satisfy, Dkt. 24 at 8 (¶48). To be "eligible" for the Fellowship, one must identify as American Indian/Alaskan Native, African American/Black, Asian American/Pacific Islander, and Hispanic/Latino. Dkt. 24 at 8 (¶44). In the past, as Do No Harm alleges, Defendants have never selected any fellows who identify as "white alone." Dkt. 24 at 8 (¶49). And the explicitly stated purpose of the Fellowship—which Defendants continue to tout in their motion, *see* Mot. 26-1 at 2—is to "increase" authorship by "members of racial and ethnic groups" that Defendants believe "have historically been underrepresented in scholarly publishing." Dkt. 24 at 8 (¶50). But for Member A's race and identification solely as a white person, Member A would have the same opportunity to apply to the Fellowship as applicants who identify as other race or ethnicity. Dkt. 24 at 10-11 (¶¶64, 72).

Contrary to Defendants' assertion that "Member A has never experienced discrimination in connection with [the Fellowship] because he or she has not applied to or been rejected from the fellowship," Mot. 10, the deprivation of the "same opportunity" to make a contract by excluding all white applicants is itself a discriminatory act under §1981, *Comcast Corp.*, 140 S.Ct. at 1019. *See also Domino's*, 546 U.S. at 476 ("[A] contractual relationship need not already exist, because §1981 protects the would-be contractor along with those who already have made contracts."); *Gratz*, 539 U.S. at 260-

61, 275-76 & n.23 (finding that the University's admissions policies violated §1981 even though one of the plaintiffs never actually applied).

**2.** The Fellowship *does* create contractual relationships between Defendants and the fellows, as Do No Harm has alleged. "In drafting § 1981, Congress … intended the term 'contract' to have its ordinary [common-law] meaning." *Lauture v. Int'l Bus. Machines Corp.*, 216 F.3d 258, 261 (2d Cir. 2000). Under §1981, a "would-be contractor," *Domino's*, 546 U.S. at 476, must show that the contractual relationship would "encompas[s] the basic elements of a contractual relationship—offer, acceptance, and consideration." *Kennedy v. D.C. Gov't*, 519 F. Supp. 2d 50, 60-61 (D.D.C. 2007). Each element exists here.

Defendants offer applicants positions in the Fellowship, and the applicants accept those offers. "An offer … may propose the exchange of a promise for a performance or an exchange of promises." Restatement (Second) of Contracts §24 & cmt.a. Defendants offer selected applicants a place in the Fellowship, including its workshops and seminars, publication opportunities, and "one year of free membership to *Health Affairs Insider* (worth about $180)," in exchange for applicants' agreeing to participate in the Fellowship under Defendants' requirements. Dkt. 24 at 6-7, 12 (¶¶35, 83, 85). Selected applicants who accept Defendants' offer thereby "manifest assent," Restatement (Second) of Contracts §50, to Defendants' terms that they, for example, participate in workshops and "'publish at least one *Health Affairs* Forefront article relating to their subject area and/or experience with the Fellowship.'" Dkt. 24 at 7, 11 (¶¶36, 76-77).

That exchange of promises counts as consideration. Consideration is a promise or performance that is bargained for in exchange for another promise or performance. *See* Restatement (Second) of Contracts §71 & cmt.d. Consideration exists if Defendants' "promise[s] induce[ ] the conduct of the" fellows and "the conduct of the [fellows] induces the making of [Defendants'] promise[s]." §71 cmt.b; *see also id.* ("[T]he law is concerned with external manifestation rather than the undisclosed

mental state: it is enough that one party manifests an intention to induce the other's response and to be induced by it and that the other responds in accordance with the inducement.").

Defendants promise to provide, among other things, "one-on-one mentorship from published researchers and *Health Affairs* editorial staff 'to increase the likelihood of publication'" and "one year of free membership to *Health Affairs Insider* (worth about $180)." Dkt. 24 at 6, 12 (¶¶35, 83, 85). Those promises, in turn, induce promises and required performances of the applicants: "partak[ing] in work-ships/seminars on publishing, peer-reviewing, research methods for racial health equity research, etc.'"; writing and "publish[ing] at least one *Health Affairs Forefront* article relating to their subject area and/or experience with the Fellowship"; undergoing "a medical examination prior to the commence-ment of duties if required [by Defendants]"; granting Defendants the right "to investigate [applicants'] background" and "releas[ing]" employers "from all liability for any damages on account of … furnish-ing … information." Dkt. 24 at 7, 11-13 (¶¶36, 76-77, 83, 90); *see Howard v. Chimps, Inc.*, 284 P.3d 1181, 1186 (Ore. App. Ct. 2012) (holding that "both parties gave consideration" where an intern "signed the release and, in exchange, defendant admitted plaintiff to the intern program and to areas of the sanctuary not otherwise open to the public").

And the applicants' promises and conduct induce Defendants' promises because they "ad-vance [Defendants'] own goals," Dkt. 24 at 12 (¶87)—the Fellowship exists to "'increase the quality and quantity of equity-related research *published in Health Affairs* authored by members of racial and ethnic groups that have historically been underrepresented in scholarly publishing.'" Dkt. 24 at 12 (¶88) (emphasis added). That goal—increasing publication by members of Defendants' favored groups—is directly advanced by Defendants' requirement and fellows' return promise to publish in *Health Affairs* Forefront, and serves as a kind of promotion benefiting Defendants.

Defendants essentially argue that that the Fellowship lacks consideration. Dkt. 26-1 at 18. Defendants argue that the "fellows' agreement to participate in workshops, publish a blog, and work

on their manuscripts is solely for their own benefit" and that it "*offers* the fellowship with no guarantee that it will ever benefit from a fellow's participation." *Id.* But that argument "is without foundation in the law" and flouts the black-letter rule that the promisee's consideration for a promise need not benefit the promisor, *see Hamer v. Sidway*, 124 N.Y. 538, 545-46 (1891) (rejecting the argument "that the promisee by refraining from the use of liquor and tobacco was not harmed but benefited" and that "unless the promisor was benefited, the contract was without consideration"); *accord* Restatement (Second) of Contracts §71, illus. 9 ("A promises B, his nephew aged 16, that A will pay B $1000 when B becomes 21 if B does not smoke before then. B's forbearance to smoke … if bargained for is consideration for A's promise."). And Defendants *do* benefit in any event: they further their goal to increase publications by minority researchers by requiring fellows to publish in *Health Affairs Forefront* and by increasing the probability of the same in *Health Affairs*. Dkt. 24 at 12 (¶¶83, 87-88). Defendants' promises are *not* gratuitous.

Although Defendants cite *Adam v. Obama for America*, 210 F. Supp. 3d 979 (N.D. Ill. 2016), that case undermines their argument. In *Adams*, an intern argued that an internship's furnishing a laptop computer for her use "and access to 'the internship itself'" constituted consideration. *Id.* at 985. The Court held that "use of the laptop does not constitute consideration because [the intern] d[id] not allege that it was bargained for." *Id.* The intern "would have to allege that she accepted the internship and agreed to perform services for [the defendant] (at least in part) because [it] *promised* her a laptop." *Id.* The intern "allege[d] that she sought out an internship position independent of any promise of material consideration from [the defendant]." *Id.* By contrast, Do No Harm makes precisely the allegations that the intern in *Adams* did not: applicants "accep[t] the [Fellowship] and agre[e] to [partici-pate] (at least in part) because [Defendants] *promis*[*e*]" workshops, mentorship, publication opportunities, a valuable subscription, and more. Dkt. 24 at 11-12 (¶¶82-86). And this is not a case where the

Defendants "did not give up anything in exchange for … performance." Dkt. 26-1 at 20. Again, Defendants promise workshops, mentorship, a valuable subscription, and publication if applicants agree to participate in the Fellowship by working on a manuscript and publishing in Defendants' outlet. *See id.* (explaining that there is consideration when a party states "'if you give me A, I'll give you B'"). Moreover, Defendants *gain* tremendously from their exchange with the fellows: they advance their goals of increasing racial-equity research as a result of bargaining for the fellows' "participation, time, manuscripts, and *Health Affairs Forefront* posts." Dkt. 24 at 12 (¶87). Defendants' attempts to argue that, in reality, their fellowship provides nothing to them or the fellows defies reality, much less Do No Harm's well-pleaded allegations.

Defendants unpersuasively rely on, *Hollander v. Sears*, 450 F. Supp. 496, 504, which is both badly reasoned and unhelpful to Defendants. There, the court held that trainee applicants who "were paid to come in and observe the performance of [certain] jobs, to try them out for short periods, and to be taught the relationships among various positions" did not form a contractual relationship with Sears because this program "was a recruiting program"—"not a hiring program" or "an apprenticeship program." *Id.* at 504-05. *Hollander* is factually distinguishable. Here, unlike in *Hollander*, Do No Harm alleges—and Defendants previously represented—that the Fellowship constitutes a training program, for which there is an exchange of promises. *See, e.g.,* Dkt. 24 at 17 (¶¶128-29). The Fellowship is *not* a temporary recruiting program.

The *Hollander* opinion also deviated from the ordinary common-law understanding of contract by asking "whether certain kinds of relationships, *although contractual in form*, may be of a kind as not to fall within the ambit of §1981." *Id.* at 504 (emphasis added); *but see Lauture*, 216 F.3d at 261 (explaining that "contract" means "the ordinary common-law definition" and that compensation for work is therefore a contract under §1981). The Court held that a relationship in which persons were "*paid* to come in and observe the performance of … jobs, to try them out for short periods, and to be taught

the relationships among various positions" was outside of §1981's reach. *Hollander*, 450 F. Supp. at 504 (emphasis added). Contrary to this observation, both payment and instruction constitute consideration supporting a contractual relationship under §1981. *See Runyon v. McCrary*, 427 U.S. 160, 172-73 (1976) ("Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments."). *Hollander*'s free-floating analysis untied to the common law of contracts cannot be reconciled with the weight of authority. *See, e.g.*, *Adam*, 210 F. Supp. at 985-86 (explaining that §1981 incorporates the ordinary common-law meaning of contracts and that contracts "in the form 'if you give me A, I'll give you B'" are protected by §1981); *Hallal v. RDV Sports, Inc.*, 682 So. 2d 1235, 1237 (Fla. Dist. Ct. App. 1996) (explaining that "participation in [an] internship program" can "constitute[] valuable consideration" with or without "money renumeration"); *Howard*, 284 P.3d at 1186 (holding that there was "an enforceable contract" between an intern and the defendant because "defendant admitted plaintiff to the intern program and to areas of the sanctuary not otherwise open to the public"). As already explained, the requirement of consideration is satisfied here because Defendants made promises in exchange for fellows' participation in the Fellowship, including publication in Defendants' outlet.[6]

Defendants close with an passing remark that "the fellowship does not create any legally enforceable contract rights." Dkt. 26-1 at 20. This argument is circular: If a contract exists, the contract necessarily gives rise to enforceable rights. *See* Restatement (Second) of Contracts §346 ("The injured party has a right to damages for any breach," including nominal damages even if the breach "caused no loss."). Moreover, it is dubious to claim that the contract would not be enforceable. If a fellow fails

---

[6] *Hagemann v. Molinari*, 14 F. Supp. 2d 277, 286 (E.D.N.Y. 1998), is irrelevant. *Contra* Dkt. 26-1 at 19. That case involved whether a volunteer was a third-party beneficiary of a contract to which he was concededly not a party. *See id.* at 286. Nothing like that is occurring here. And the Fellowship is not an internship at all, let alone one in which there is no return consideration. *See Marvelli v. Chaps Cmty. Health Ctr.*, 193 F. Supp. 2d 636, 659 (E.D.N.Y. 2002) (explaining that interns were not employees because of "'the absence of either direct or indirect economic renumeration'").

to participate in the seminars or submit the required submissions, Defendants could exercise their right to expel the fellow from the program and withhold the other promised benefits, such as the "one year of free membership to *Health Affairs Insider*." Dkt. 24 at 6-7, 12 (¶¶35, 83, 85). Likewise, if Defendants fail to provide the promised benefits or cancel the Fellowship, fellows would have remedies—contrary to Defendants' unsupported assertion. Dkt. 26-1 at 20-21. For instance, if a fellow spends money for travel to attend a workshop that gets canceled, or if the Fellowship does not provide a year's worth of free access to *Health Affairs Insider* (of $180 in value), the fellows could seek consequential, actual, or nominal damages in an action for breach of contract. *See* Restatement (Second) of Contracts §346 ("The injured party has a right to damages for any breach," including nominal damages even if the breach "caused no loss."). That specific performance (e.g., requiring Defendants or fellows to fulfill their promises) may be unavailable to remedy a breach, *see* Dkt. 26-1 at 20, does not undermine the existence of *any* remedy, let alone a contract. And none of these arguments matter now because Do No Harm is suing to give its members the "same *opportunity* to enter into contracts" regardless of race; it is not suing Defendants for breach of contract. *Comcast Corp.*, 140 S.Ct. at 1016 (emphasis added).

> C.     **Do No Harm has stated a claim under D.C law.**

Defendants do not seriously dispute the sufficiency of Do No Harm's claims under D.C. law. Do No Harm brought a claim based on Defendants' race-based discrimination and a separate claim based on Defendants' race-based publishing. *See* Dkt. 24 at 17-18 (¶¶124-32) (discrimination claim), (¶¶133-40) (publication claim). Under D.C. law, it is "unlawful discriminatory practice …, wholly or partially for a discriminatory reason based upon the actual or perceived rac[e] … of any individual," D.C. Code §2-1402.11(a), for an employer "[t]o discriminate against any individual in admission to … any program established to provide apprenticeship or other training or retraining," §2-1402.11(a)(4)(A). And it is similarly unlawful for an employer to "indicat[e] any preference … based

on the race, color, … [and] national origin." §2-1402.11(a)(4)(B).[7] As the D.C. Court of Appeals has explained, the D.C. Human Rights Law is "to be generously construed" with its "broad remedial" goal and the fact that it is "a 'powerful, flexible and far-reaching prohibition against discrimination of many kinds.'" *Geo. Wash. Univ. v. D.C. Bd. of Adjustment*, 831 A.2d 921, 939 (D.C. 2003).

Defendants first argue that Do No Harm's members have not been victims of discrimination because they have not applied. Dkt. 26-1 at 15-16. Yet Defendants' categorical exclusion of white applicants from the Fellowship is plainly a discriminatory act. §2-1402.11(a)(4)(A). And this exclusion was "wholly or partially for a discriminatory reason based upon the actual or perceived rac[e] … of any individual"—*e.g.*, because they are white. §2-1402.11(a); *see Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) ("[D]irect evidence of intent is 'supplied by the policy itself'"). Defendants' "No Whites" requirement violates D.C. law, much like a "Whites Only" requirement would. *Teamsters*, 431 U.S. at 365.

Defendants next argue that "[they] are neither an employer with respect to [the Fellowship] nor a professional association, and [the Fellowship] is not a training program." Dkt. 26-1 at 16. But the argument that Defendants, through the Fellowship, are not a covered employer lacks purchase because D.C. Human Rights Law defines employer to include "any professional association." §2-1401.02(10). The definition of "employer" includes two parts: "any person who, for compensation, employs an individual" and, *separately*, "any professional association." §2-1401.02(10). The Fellowship run by Health Affairs constitutes a training program organized by a professional association as it consists of a group of healthcare professionals "organized to practice their profession together" and "for education [and] social activity." *Professional Association*, *Black's Law Dictionary* (11th ed. 2019); *see also* Dkt. 24, at 6-7 (¶¶35-36). And the language of the Act does not require that applicants or fellows be employees of the professional association. The prohibition covers "*any individual*" against whom an

---

[7] Defendants make no specific arguments regarding the publication claim.

employer—in this case, a professional association—discriminates "in admission to" a training program. *See id.* §2-1402.11(4) (emphasis added). There is no requirement that compensation awaits.

That the Fellowship constitutes a training program is evident from the Fellowship's name (Health Equity Fellowship for *Trainees*) and the fact that the Fellowship "consists of monthly meetings, seminars, and events" and of mentoring the fellows to publish articles. Dkt. 24 at 17 (¶129). And as Do No Harm alleges, Defendants have openly stated that the Fellowship constitutes a "'training program.'" Dkt. 24 at 17 (¶129) (quoting Dkt. 16-3 at 5 (Watts Decl. ¶10)). In addition to these specific allegations, consistent with the remedial purpose of D.C. law and Rule 12(b)(6), all reasonable inferences must be drawn in Do No Harm's favor. Do No Harm sufficiently alleges that the Fellowship constitutes a training program run by a professional association covered by D.C. law.

### D.     Defendants' other arguments are forfeited and otherwise unavailing.

Defendants raise various arguments in passing that their racial exclusion of white applicants "is protected by the First Amendment" and somehow supported by Title VII. Dkt. 25-1 at 17. These arguments, however, are forfeited as undeveloped. And they are wrong regardless.

This Court should reject these arguments for now because, apart from a few citations, Defendants do not make any supporting arguments. "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). "[A] litigant has an obligation to spell out its arguments squarely and distinctly." *Id.*; *see also Cox v. Nielsen*, 2019 WL 1359806, at *14 (D.D.C. Mar. 26, 2019) (observing that "undeveloped" arguments "should … be deemed forfeit").

Any Title VII argument would also fail. The Supreme Court has never approved an outright exclusion of a disfavored racial group from a program—like Defendants' Fellowship—even in the Title VII context under *United Steelworkers of America v. Weber*, 443 U.S. 193, 202-04 (1979). At most,

the Supreme Court said in *Weber* and *Johnson v. Transportation Agency*, 480 U.S. 616 (1987), that certain affirmative action plans could survive Title VII's scrutiny. But doing so would require Defendants to make a detailed factual showing that a manifest imbalance exists and that the adopted program does not "unnecessarily trammel" on the rights of the excluded racial groups. *Hammon v. Barry*, 826 F.2d 73, 78 (D.C. Cir. 1987). Making that factual showing is impossible at the pleading stage, where Do No Harm's allegations must be accepted as true and there been no discovery or any evidence submitted by Defendants. Furthermore, Defendants fail to show that it is appropriate to import the *Weber* framework to Title VI, §1557, §1981, and D.C. law or whether it even remains good law at all. "Some underpinnings of … *Johnson* were removed by *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)." *Hill v. Ross*, 183 F.3d 586, 589 (7th Cir.1999); *Finch v. City of Indianapolis*, 886 F. Supp. 2d 945, 961 n.15 (S.D. Ind. 2012) (questioning whether the *Weber* framework remains good law). In any event, Defendants do not develop this argument in its motion so the Court should not consider it. *Schneider*, 412 F.3d at 200 n.1; *Cox*, 2019 WL 1359806, at *14.

Defendants' First Amendment defense similarly falls short. It is too undeveloped and requires fact-finding that is inappropriate at the pleading stage. It would also fail as a matter of law. For starters, Title VI—and by extension, §1557—"invokes Congress's power under the Spending Clause to place conditions on the grant of federal funds." *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). "'Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination.'" *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1170 (D.C. Cir. 2004). In exchange for federal financial assistance, Defendants have agreed not to discriminate on the ground of race. Defendants cannot now cry foul. "[I]f a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev. v. Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). Congress is "not required by First Amendment to subsidize" Defendants' desire to racially exclude white applicants. *Regan*, 461

U.S. at 546; *see also Grove City Coll. v. Bell*, 465 U.S. 555, 575-76 (1984) ("Requiring Grove City to comply with Title IX's prohibition on discrimination as a condition for its continued eligibility [for federal funds] infringes no First Amendment rights of the College or its students.").

Furthermore, §1981, Title VI, §1557, and D.C. law do not implicate the First Amendment because they prohibit racially discriminatory *conduct*—not expression or expressive association. "[T]he [*p*]*ractice* of excluding" people based on race is not "protected by" the First Amendment. *Runyon*, 427 U.S. at 176 (emphasis added). Nor has it ever been. *See id.* ("'[T]he Constitution … places no value on discrimination, and while '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment … it has never been accorded affirmative constitutional protections.'"). In *Runyon*, the Supreme Court rejected a similar First Amendment argument, holding that application of §1981 to a private school that had a racially exclusionary admissions policy did not violate the First Amendment. *Id.* While Defendants appear to be citing *NAACP v. Alabama*, 357 U.S. 449, that decision was about whether compelled disclosure of membership lists violated the First Amendment, *see id.* at 461-66. It had nothing to do with enforcing an antidiscrimination statute against a corporation that racially discriminates.

Even if Defendants' First Amendment rights were implicated, the racial discrimination bans under §1981, Title VI, section 1557, and D.C. law would survive strict scrutiny. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("eradicating [sex] discrimination" constituted compelling interest); *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983) ("eradicating racial discrimination in education" constituted compelling interest). Furthermore, as demonstrated above, prohibiting Defendants' racial discrimination would be "no greater than is necessary to accomplish" Congress's "legitimate purposes." *See Roberts*, 468 U.S. at 628-29. In short, racial discrimination is "entitled to no constitutional protection." *Id.* at 628–29. And Defendants do not really argue otherwise here.

## CONCLUSION

For all these reasons, the Court should deny Defendants' motion to dismiss the amended complaint.

Dated: January 18, 2022

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy (DC Bar No. 489651)
Cameron T. Norris (VA Bar No. 91624)
Frank H. Chang (DC Bar No. 1686578)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com

## CERTIFICATE OF SERVICE

I filed this response via ECF, which will email everyone requiring notice.

Dated: January 18, 2022

*/s/ Cameron T. Norris*